MARY L. H. ASHTON *vs.* TAX ASSESSORS OF THE TOWN OF

JAMESTOWN.

APRIL 27, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. This is a petition brought in accordance with the provisions of general laws 1923, chapter 60, sec. 15, as amended by public laws 1932, chapter 1945, sec. 4, for relief from alleged overvaluation of petitioner's real estate for 1935 by the assessors of taxes of the town of Jamestown. The case was tried by a justice of the superior court sitting without a jury, who found that the full, fair cash value of petitioner's estate was $31,250 instead of $53,750, the assessors' valuation. He therefore gave decision for the petitioner for $450, with interest from the date of payment. This sum represents the tax paid by the petitioner on the excess valua-

tion of $22,500, at the rate of $20 per one thousand dollars, the tax rate of the town of Jamestown for the year 1935.

The case is before this court on respondents' bill of exceptions, consisting of thirty exceptions, twenty-four of which are to the admission or exclusion of testimony during the trial, and six are to the findings and decision of the trial justice. Exceptions 1, 2, 6, 7, 8, 10, 15, 17 and 18 are expressly waived; exceptions 16, 25 and 26, being neither briefed nor argued, are deemed to have been waived. Exceptions 27, 28, 29 and 30, which question the findings and decision of the trial justice, raise the real issue in the case and will be first considered by us. Under these exceptions, the respondents contend that the findings and decision of the trial justice in favor of the petitioner are contrary to the law and the evidence and the weight thereof.

The Ashton estate, so-called, although consisting of two parcels of land, which are separated from each other by Racquet Road, is used as a unit by the petitioner for a summer residence. For purposes of taxation and in compliance with the mandatory provisions of G. L. 1923, chap. 59, sec. 4, these two parcels of land were separately assessed by the assessors in 1935 as lot 15 on assessors' plat 10 and lot 330 on assessors' plat 9. Lot 15, on which is the petitioner's house and other main buildings, is bounded on one side by Racquet Road. Its area is 367,340 square feet, or a little more than 8.43 acres of land. The assessors' valuation of this lot was $47,500, divided as follows: land—$19,000; buildings—$28,500. Lot 330 is on the opposite side of Racquet Road and extends to the shore. On this lot there is the chauffeur's house, a boat house and a pier. Its area is 54,779 square feet, or a little more than 1.25 acres. The assessors valued this lot at $6250, allowing $1500 for the land and $4750 for the buildings and improvements. The petitioner concedes that the assessors' valuation of lot 330 is fair but contends that their valuation of lot 15 is excessive. Unless otherwise distin-

guished, the word "lot", as used by us in this opinion, includes both land and improvements.

The town of Jamestown is on the Island of Conanicut. The evidence clearly shows that the petitioner's property is in the most exclusive part of Jamestown and that her house is palatial and modern in every respect. Describing this property in his decision the trial justice, referring particularly to lot 15, says: "The Ashton property is extensive in area, and part of the land is covered with a natural growth of wild brush. Some of it is, *by comparison with the rest*, very low land, while the part on which the house is located is very high, cleared and presents a very pleasing appearance. There are extensive driveways leading to the house. The house is very large and, in the judgment of the Court, in excellent condition, and affords an extensive and very beautiful view of the Ocean, the entrance to Narragansett Bay, the Bay itself. One can look over to Newport, and over a large part of the Island of Conanicut. There is nothing unique about the Ashton house in its construction, other than, perhaps, in its size. It is very large, contains a great many rooms, but in the matter of construction it is a frame house of ordinary construction, very finely equipped, and, as I say, in very excellent condition." (italics ours) This summary description of petitioner's lot 15 and the house thereon is fully supported by the testimony and the photographs in evidence. In addition to the house referred to by the trial justice, there is on lot 15 a large garage with living quarters over it, a smaller two-car garage, and a power house, all admittedly in good condition.

To sustain her contention of overvaluation, the petitioner relies upon the testimony of three experts on real estate. All three of these experts valued lot 330 "at", or "about", or in the "neighborhood of" $6000. No fault was found by them with the assessors' valuation of $6250 for this lot. When they came to fix the value of lot 15, all three testified that its fair market value was "about", or "you might get as high as", or

"not more than" $25,000. The only one of these experts, who gave any testimony of the sale of nearly comparable property in Jamestown was at the time of the trial and for twelve years prior thereto had been in the employ of the petitioner.

The sales mentioned by this expert are identified in the testimony as the Leary, Clothier, Newhall and Watson properties. We find it necessary to refer to his testimony concerning these sales. He testified that the Leary property, which is about one-quarter of a mile from the petitioner's land, consisted of 2.965 acres of unimproved land extending to the shore. It was sold in August 1934 for $4000. The Clothier property, which he said was between one-quarter to one-half mile from the petitioner, had eleven acres of land, very little of which was cleared, but with considerable frontage on the water. The house on this property was about the size of the petitioner's house, but unlike that of the petitioner, it was not modern in its equipment and was in need of repair. This property was sold in August 1935 for $10,000 and one year's tax of $1020, or $11,020.

The Newhall property, which adjoins petitioner's lot 330 on the north, consisted of one and three-quarters acres of unimproved land fronting on Narragansett Bay. It was sold in June 1935 for $2500. The Watson property, about one-eighth of a mile from the petitioner's property, had three-quarters of an acre of land with a house greatly inferior to that of the petitioner. This inland property with a right of way to a common beach was sold in April 1936 for $7500.

The other two experts for the petitioner had no personal knowledge of any sales in Jamestown. They arrived at their valuation of petitioner's property from general experience and by "acquainting" themselves with the sales and the properties that we have just mentioned. One of these witnesses, in attempting to support his valuation of petitioner's lot 15, testified that part of that lot was a "jungle"; that "when we get down to cold facts and not theory, it is what

I would call a great white elephant"; that "I say frankly I had to tip over backwards to reach $25,000"; and that "If the owner could only feed his army of servants on view, and pay them off at the end of the month on view, it would be a wonderful place to own." These and other similar remarks by this expert lessens somewhat the weight to be given to his testimony.

The testimony of the three experts for the petitioner, while uniform in its valuation of $25,000 for lot 15 and $6000 for lot 330, is in a sense contradictory and indefinite. The first one of these, a resident of Jamestown, testified that: "When we sell property in Jamestown, we sell view. In order to get view you got to pay for high land." The other two greatly minimized this element of value. All three refer to the Clothier property as quite similar to that of the petitioner, yet they all stated, in substance, without saying why, that they were not directly influenced by that sale in fixing the market value of the petitioner's property. We also note that not one of these experts separated their market value of $25,000 for petitioner's lot 15 into its component elements of land and buildings, as the assessors had done.

The respondents rely upon the testimony of four experts on real estate to support their valuation of the petitioner's property, especially lot 15. Without going into details, these experts, in effect, agreed that the sales mentioned by the petitioner's experts were not sales of property comparable to that of the petitioner. Referring specifically to the Clothier property they testified that, except as to its area and the view from the house, it was not to be compared with the petitioner's property. According to their testimony the Clothier house, which was built on a high rock, was odd in design, difficult of access, old and in general disrepair, as were also the surrounding grounds and driveways. The testimony of these experts further shows that the Clothier property immediately adjoins Fort Wetherell, a United States military reservation, from which heavy guns are fired in target practice at

indeterminate periods, especially in the summertime. They were all of the opinion that this feature seriously affected the market value of that property. One said that even if the guns were fired but once a year "It would minimize the situation a great deal;" another, that the fort stands out "like a sore thumb"; and another, that "The Clothier property has been in the market for years, and that (the fort) is one drawback."

The respondents' experts considered lots 15 and 330 as component parts of one estate, which was the way that they were in fact used by the petitioner. For the purposes of the trial three of them treated these lots separately as the assessors had done in complying with the requirements of the statute. The market value of the petitioner's property fixed by these experts was as follows. (1) $50,250, both lots, without further specification. (2) Lot 15, $64,225: land $16,800; buildings— $47,425. Lot 330, $9,950: land— $2000; buildings—$7950. (3) Lot 15, $51,400: land— $21,000; buildings $30,100. Lot 330, $8000, without further specification. (4) Lot 15, $65,000: land—$20,000; buildings —$45,000. Lot 330, not valued.

What we are now about to say involves some mathematical calculations based upon the valuations testified to in this case. We will consider the testimony of each set of experts separately and state such calculations in round figures, omitting, as far as possible, the repetition of details. The petitioner's experts admit that the assessors' valuation of petitioner's lot 330 is fair. According to this valuation we find that the land in that lot is valued at $1200 an acre. The Leary land sold for $1333 an acre and the Newhall land brought $1428 an acre. It thus appears that the assessors' valuation of $1200 an acre for the land in lot 330 is fully supported by actual sales of comparable land, according to the testimony of petitioner's own experts.

We are unable to apply a similar test to the valuation by petitioner's experts of the land in lot 15, as their valuations

are all in the lump sum of $25,000 without specification. Furthermore, the sale price of the Clothier property is of no more assistance to us than it was to these experts. For reasons not apparent, they give slight consideration to the price paid for the Clothier property in fixing their valuations of petitioner's lot 15. There is, however, a suggestion in the record that the Clothier property was sold under stress of financial and family conditions, and it is a fact that an overdue tax of $1020 was included as part of the purchase price. The overdue tax which the purchaser of the Clothier property assumed in that sale represents an assessed valuation of $51,000.

There being no question respecting the assessors' valuation of lot 330, we will now consider briefly only the valuations of lot 15 by the experts for the respondents. Taking the testimony of the three experts who subdivided their market values of this lot into an allowance for land and for buildings, we find that the average of such values, as apportioned by them, is $19,266 for about eight and one-half acres of land, or $2266 an acre, and $40,808 for the buildings.

With the evidence in this condition, the trial justice set the fair market value of lot 15 at $25,000, which, added to the assessors' valuation of $6250 for lot 330, gave a total of $31,250 as the fair market value of the petitioner's entire estate. In reaching this decision, the trial justice refers to the great difference in the valuation of lot 15 by the two sets of experts and says: "The testimony of the experts in this case might, to one who had not heard experts testify before, seem a little startling. . . . Under these circumstances the Court finds itself confronted with a situation where it either *must* accept the figures on the one side or the other, or make some guess of its own." (italics ours) The trial justice then accepted the testimony of the experts for the petitioner and fixed the valuation of lot 15 at $25,000 in strict conformity with such testimony. This was error.

The great weight of authority is that, with certain rare exceptions which need not concern us now, expert testimony is to be examined and considered by the triers of facts, whether court or jury, like that of any other witness, together with all the other evidence in the case. Expert testimony is ordinarily entitled to only such weight as the evidence considered as a whole and the proper inferences therefrom reasonably warrants. 22 C. J. 729. A trier of facts is not justified in arbitrarily disregarding the testimony of experts; neither is he warranted in accepting such testimony as binding irrespective of all other evidence. It is the duty of a trial justice who is passing upon an issue of fact to determine such issue according to his own judgment, upon all the evidence, enlightened but not controlled by the opinion of experts. *Barry* v. *Kettelle,* 49 R. I. 50; *Fletcher & Bros.* v. *Seekell,* 1 R. I. 267. To say that the testimony of one or another set of experts must be taken as controlling, as the trial justice did in this case, is to say, in effect, that such testimony can be substituted for the considered judgment of the court on all the evidence in the case. We find no support for such a view.

In his decision as to lot 15, the trial justice allows $6000, or $750 an acre, for the land and $19,000 for the buildings. We find nothing in the record before us to justify his finding that $750 an acre is fair." The experts whose testimony he adopted as controlling did not say so, and no such price per acre is shown by any sale of so-called comparable land. The evidence is clear that the land in petitioner's lot 330 was valued at $1200 an acre; in the Leary lot at $1333 an acre; and in the Newhall lot at $1428 an acre.

To support his allowance of $19,000 for the buildings on petitioner's lot 15, the trial justice refers to the sale of the Clothier property, which her experts practically disregarded in fixing their valuation of lot 15 at $25,000, in the following language: "The price of $11,000 for that property would seem to indicate to the Court that the value of land, as land

alone, played but a small part in determining the value of the Clothier property, but rather that the predominating influence, or the real thing that was purchased, was the house." This inference is not supported by the evidence. The trial justice then says: "$19,000 for the value of the Ashton house, seems to the Court, on the state of the testimony here, to disclose a reasonable value for that property. It is almost twice the price paid for the Clothier house." This tends to support the suggestion in evidence that the Clothier property was not sold at a fair sale and, therefore, such sale is of no assistance in this case.

We recognize that many circumstances may affect the value of real estate, yet, in determining its fair market value for purposes of taxation, due and equal consideration should be given to the rights both of the owner and of the municipality. In the instant case we are convinced that the trial justice was clearly wrong in fixing $25,000 as the fair market value of petitioner's lot 15, and for this reason we cannot give his decision the weight that this court ordinarily gives to a decision of a trial justice.

A careful examination of the entire record leads us to conclude that the valuation of petitioner's lot 15 by her experts is too low, and that the valuation of that lot by the experts for the respondents is too high. We appreciate that it is quite impossible to determine the value of this property for purposes of taxation with mathematical accuracy. Giving due consideration to the testimony of the experts for both parties and weighing such testimony in the light of all the other facts and circumstances in evidence in this case, we are of the opinion that $35,200 was the fair taxable value of petitioner's lot 15 in June 1935, when the tax now in question was assessed.

For the purposes of analysis only, this valuation may be broken up into an allowance of $10,200 for approximately eight and one-half acres of land at $1200 an acre, and an allowance of $25,000 for the increased value of that

land by reason of the buildings and improvements thereon. The valuation of lot 15 at $35,200 added to the original and undisputed valuation of lot 330 at $6250 gives $41,450 as the fair market value of petitioner's property as a unit in June 1935. The assessors' valuation of petitioner's lots 15 and 330, which were used by her as a unit, at $53,750 is excessive by $12,300. The tax on this excess at the rate of $20 per one thousand dollars amounts to $246. The petitioner is entitled to interest on this sum at the rate of six per cent from the date of payment of such excess tax by her. Respondents' exceptions 27, 28, 29 and 30 are sustained.

Respondents, by their exceptions 12, 13, 14, 19, 20, 21 and 22, contend that the trial justice erred in excluding certain questions to two building experts as to the cost of construction or the value of the buildings, as such, on petitioner's lot 15 and on the Clothier property, with special reference to the house on each of these properties. Their contention is that as the petitioner's estate, particularly the portion included in lot 15, was described as "exclusive", "pretentious" and "unique" in the testimony of some of the experts on real estate, that, therefore, they were entitled to introduce evidence of the cost of construction of those buildings or of their value as buildings in support of their assessment. This contention is without merit.

These experts, who qualified only as experts in building construction, were not qualified to testify to the value of land, which may be increased or diminished by the buildings thereon. Cost of construction ordinarily has no bearing on the value of property. The unit of value for the purposes of taxation is the property as a whole, including both land and improvements. *Hervey* v. *City of Providence,* 47 R. I. 378; *Burden* v. *Tax Assessors of Newport,* 47 R. I. 473; *Aspegren* v. *Tax Assessors of Newport,* 125 A. 213, (R. I.).

The respondents refer us to the case of *Goelet* v. *Tax Assessors of Newport,* 54 R. I. 306, as a decision in point. That case is no authority for their contention in this case. With-

out discussing the opinion in the *Goelet* case, which speaks for itself, we point out that there it was a question of unduly restricting *cross-examination*, while in the instant case the respondents claim the right to introduce testimony of the cost of construction as evidence in chief. In view of what we have already said, further discussion of this point is not necessary. Respondents' exceptions 12, 13, 14, 19, 20, 21 and 22 are overruled.

The exceptions of the respondents not specifically referred to by us have been considered and found to be without merit. They are overruled. All of the respondents' exceptions, other than exceptions 27, 28, 29 and 30, which we have sustained, are overruled.

The record before us clearly shows that this case was fully tried by both parties in the superior court. To remit the case to that court for a new trial would result in unnecessary delay, inconvenience and expense. Justice requires that there be an end to this litigation at this time.

In the circumstances, therefore, either or both of the parties may appear before this court on May 23, 1938, and show cause, if any they have, why the case should not be remitted to the superior court with direction to enter judgment for the petitioner in the sum of $246, and interest from the date of payment.

*Sheffield & Harvey, J. Russell Haire,* for petitioner.

*Max Levy, John H. Nolan, Arthur J. Sullivan,* for respondents.