[S. F. No. 17737. In Bank. Nov. 17, 1948.]

LIBERTY MUTUAL INSURANCE COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JOE SERAFIN, Respondents.

Leonard, Hanna & Brophy and E. D. Leonard for Petitioner.

T. Groezinger and John A. Rowe, Jr., for Respondents.

CARTER, J.—The Industrial Accident Commission determined that respondent Joe Serafin was entitled to a 32¼ per cent permanent disability rating by reason of the condition of his right hand which was the result of an industrial injury. The sole contention is that the evidence is insufficient to support that rating.

The employee, a carpenter, was examined by Dr. Duggan, acting assistant medical director of the commission, on January 6, 1947, and an informal rating of 8½ per cent permanent disability was made. The employee filed an application for adjustment of claim in March, 1947. In that proceeding the report of the employee's physician, Dr. Silberman, showed a loss of grasping strength in his right hand of 25/80, and concluded with the statement that: "His condition is stationary and permanent. Residual factors on which it is believed a permanent disability rating should be based are: pain and swelling, increased on use, restricted motion, impaired grip and tenderness on palpation." In April, Dr. Harrison, assistant medical director of the commission, examined the employee and found several factors of disability. His report stated: "As requested, I have examined this applicant this morning with reference to his right major hand.

"He states that at irregular intervals, particularly when his hand is tired and warm, he experiences a sudden sharp pain extending from the metacarpophalangeal joints of the middle and ring fingers to the elbow. When this occurs he frequently drops any object he may be holding. He states that for perhaps one hour he experiences 'cramps' in the hand. Cold weather does not affect his condition, but in warm weather it is worse.

"There is some thickening over the second metacarpophalangeal joint and pressure over the metacarpophalangeal joint of the ring finger causes some pain. The tip of the thumb fails the base of the middle finger by 1¾"; on the opposite side the tip of the thumb fails the base of the middle finger by ½". In abduction the tip of the thumb fails the shaft

of the second metacarpal by 2¾″; on the opposite side by 3″.

"In making a fist the tip of the index finger fails the palm by 2⅞″, the tip of the middle finger by 1¾″, the tip of the ring finger approximates the thenar eminence 1 1/6″ proximal to the palmar crease, the tip of the little finger approximates the hypothenar eminence 1″ proximal to the palmar crease. There is 20° lack of extension in the proximal interphalangeal joint of the ring finger. There is 22° lack of extension in the distal interphalangeal joint.'' He found a loss of grasping power of 15/165. He also said he believed the employee did not exert his best efforts in grasping. The employee testified that he could not use his right hand and was not able to do any work; that there was pain in his hand when he attempted to pick up articles; that his right hand is not as strong as his left and he cannot "squeeze" much with it; and that he has no grip in his right hand. He stated that in the examinations by all the doctors he put forth his best effort in the gripping tests.

The doctors for the insurance carrier gave varied figures on the gripping potentiality of the right hand as compared to the left, as follows: Dr. McCarthy, 85/100, 75/95, 75/115, 75/120, 80/125, 80/115, 60/90; Dr. Cline 70/0, 80/0; Dr. Roynes, 85/100; 75/115; Dr. Sale, 50/110. They testified that the employee was not making a proper effort with his right hand when being tested on the dynamometer, the device used for testing grasping strength.

It will be seen from the foregoing that the rating given (32¼ per cent of which 1 per cent was for pain, leaving 31¼ per cent representing a difference between the right and left hand of 30/165) was within the range of the testimony given by the various witnesses which ran the gamut from practically no loss of grasping strength to 100 per cent loss. No witness testified to the exact figure (30/165), and, therefore, petitioner claims that the award cannot stand because the referee arbitrarily chose a figure not supported by any evidence, and reference is made to the referee's report where he said: "Mr. Jakobson seems to be very earnest in his attitude that the case should not rate over 8½%, as was given on the informal rating. Dr. Harrison on April 1, 1947, found the right grip, under three tests, 10-15-10. He thought the applicant was exaggerating the loss of grasping power, but naturally he could not say how much, so I simply decided that the applicant was probably doing half as well as he could, and therefore fixed the loss of grasp at 30/165. Mr. Jakobson complained

that there was no evidence any place, at any examination, of it being over 30/165. I told him the theory under which I had made the rating, and that of course I could have taken it at 15/165, and might get into trouble in an endeavor to do what seemed to be the equitable rather than the strictly legal thing.

"I suggested that the parties add the 8½% and 32½%, which of course makes 41%, divide it by 2, which would give a 20½% rating, and if they wanted to discuss settlement on that basis, perhaps because of the uncertainties of the case, and the difficulty of being mathematical, it might be the best disposition of the case. I told the parties, however, that I had just as much right, perhaps more authority, to determine the doctor's feelings that the man was not honestly doing the best he could to grasp the dynamometer or hand, were not as persuasive to me as the man's sworn testimony based on a general estimation of his capacity for veracity that he had done the best he could, and that there was some difficulty in the hand, not immediately perceivable by these examining doctors, responsible for the loss of grasping power; that I would hesitate to believe that a carpenter of this man's age and general appearance, whose reputation for veracity was unchallenged, and who could make the money he could now make as a carpenter, would claim the disability he claims unless he either had it or believed he had it, which amounted to the same thing as not having the grasping power. That 32½% [32¼%] was not a tremendous rating for any carpenter who had lost a great amount of the usefulness of his right hand."

■ In the first place it is a panel of the commission and not the referee who makes the findings and award. (See, Lab. Code, § 5800; *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 492 [175 P.2d 823]; *Pacific Indem. Co.* v. *Industrial Acc. Com.*, 28 Cal.2d 329 [170 P.2d 18]; *California Shipbuilding Corp.* v. *Industrial Acc. Com.*, 27 Cal. 2d 536 [165 P.2d 669]; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 19 Cal.2d 622 [122 P.2d 570, 141 A.L.R. 798].) The reports of the referee reviewed the evidence and referred to the medical reports on file. Under these circumstances we cannot say that the commission followed the same reasoning as the referee, even if we assume it to be pertinent and erroneous. It is presumed to have made its decision on all the evidence. Moreover, petitioner's petition for rehearing before the commission made the same point and argument as now

made and it was denied. Further in this connection reference is made to the disability rating schedule of the commission which is based upon "the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market." (Lab. Code, § 4660.) Which schedule the "commission may prepare, adopt, and from time to time amend, . . . for the determination of the percentages of permanent disabilities in accordance with this section. Such schedule shall be available for public inspection, and without formal introduction in evidence shall be prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule." (Lab. Code, § 4660.) There is no contention that the disability report of the referee (showing loss of grasping power) did not support the percentage of disability in that schedule, and, in any event such schedule is only prima facie evidence. The issue determined by the commission from all the evidence was, as to the major factor, the extent of loss of grasping power, and the only problem presented here is the sufficiency of the evidence to support the award.

▪ A review of the record discloses that there is ample evidence that the employee lost all grasping power (the employee's testimony) as well as evidence that he lost practically none, and evidence by an expert of a 15/165 loss which is greater than the finding of 30/165. There is evidence of other factors such as pain and inability to flex the fingers. Plainly this evidence is sufficient to support the award.

▪ It is the province of the commission to resolve conflicts in the evidence and that includes the factors of observation of the employee's disability, the extent, if any, to which the employee was not exerting his full effort on the dynamometer when tested, and the effect of that factor on the various views as to the relative grasping power of the injured and normal hand. Arriving at a decision on the exact degree of disability is a difficult task under the most favorable circumstances. It necessarily involves some measure of conjecture and compromise by the finder of fact as certainly would occur in the mental processes of a so-called expert witness. ▪ When the commission is confronted with widely divergent views as to the extent of the loss of function of the body, further complicated by the possibility of lack of cooperation or faking in various degrees by the injured

person, it may make a determination within the range of the evidence as to the degree of disability. Applicable here is the rule followed in other cases where the trier of fact does not adopt exactly the view of any expert witness as to value. ▉ The trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence. (*Union Hollywood W. Co.* v. *Los Angeles,* 184 Cal. 535 [195 P. 55]; *East Bay Mun. Utility Dist.* v. *Kieffer,* 99 Cal.App. 240 [278 P. 476, 279 P. 178]; *Ashton* v. *Tax Assessors of Town of Jamestown,* 60 R. I. 388 [198 A. 786]; *Smith* v. *Faris-Kesl Const. Co.,* 27 Idaho 407 [150 P. 25]; *Murray* v. *United States,* 130 F.2d 442; *Phillips* v. *United States,* 148 F.2d 714.) That rule is based on a broader principle discussed in *Arais* v. *Kalensnikoff,* 10 Cal.2d 428, 432 [74 P.2d 1043, 115 A.L.R. 163], where this court said: "Whatever claims the medical profession may make for the test, in California 'no evidence is by law made conclusive or unanswerable unless so declared by this code.' (Sec. 1978, Code Civ. Proc.) Expert testimony 'is to be given the weight to which it appears in each case to be justly entitled.' (*State Compensation Ins. Fund.* v. *Industrial Acc. Com.,* 195 Cal. 174 [231 P. 996].) The law makes no distinction whatever between expert testimony and evidence of other character (*Treadwell* v. *Nickel,* 194 Cal. 243 [228 P. 25].) Although it encourages the demonstration of the truth of the issues before a court by any means which are generally accepted as tending to prove the facts in dispute, 'when there is a conflict between scientific testimony and testimony as to facts, the jury or trial court must determine the relative weight of the evidence.' (*Rolland* v. *Porterfield,* 183 Cal. 466 [191 P. 913].)

"These are fundamental rules which are firmly embedded in the law of evidence. However, the appellant contends that an exception has been made of medical testimony by the decision in *William Simpson Const. Co.* v. *Industrial Acc. Com.,* 74 Cal.App. 239 [240 P. 58, 59], and cases which have followed it, and relies particularly upon a statement in the Simpson case to the effect that medical evidence is, in certain cases, 'conclusive upon the question in issue.' There the cause of death was in dispute. A workman fell from a scaffold and an autopsy performed by two physicians showed a hemorrhage in his brain and a fracture of his skull. Each physician testified that, in his opinion, a stroke of apoplexy caused the hemorrhage prior to the fall and was the cause of

death. The Industrial Accident Commission disregarded this testimony and found that death resulted from the fractured skull. In reviewing the case the court discussed the effect of medical evidence 'where the subject is one for experts or skilled witnesses alone,' and held that 'the Commission was not bound by the opinion of the medical experts that the proximate cause of the death of the deceased was the stroke of apoplexy.' However, it annulled the award because there was no evidence of any kind tending to prove that death resulted from the fall. The decision is, therefore, directly contrary to the position of the appellant here, although some of the language of the opinion taken out of context seems to support it.

"In discussing the subject of expert testimony in the Simpson case, the court cited several cases in which damages were claimed because of the alleged malpractice of a physician, and then said: 'The rule to be drawn from these decisions, as we understand them, appears to be that whenever the subject under consideration is one within the knowledge of experts only, and is not within the common knowledge of laymen, the expert evidence is conclusive upon the question in issue. It follows that in such cases, neither the court nor the jury can disregard such evidence of experts, but, on the other hand, they are bound by such evidence, even if it is contradicted by nonexpert witnesses.' (P. 243.) The general rule is that the law does not require expert testimony to be offered wherever relevant. Malpractice cases are an exception. In such a case the plaintiff must prove by members of the defendant's profession the standard of care or skill ordinarily used in the practice of that profession at a particular place. (*Perkins* v. *Trueblood,* 180 Cal. 437 [181 P. 642]; *Callahan* v. *Hahnemann Hospital,* 1 Cal.2d 447 [35 P.2d 536].) The reason for the exception is obvious. Only physicians who practice their profession at a particular place could have any knowledge of the method of treatment customarily used by the other members of the profession practicing there; the subject, therefore, calls for expert opinion only. But the testimony of an expert in such a case is not conclusive in the sense that it must be accepted as true. Indeed, there is often considerable disagreement between different witnesses concerning the standard of care or skill ordinarily used and the trier of fact must resolve the conflict thus raised. It is conclusive, however, to the extent that it may not be contradicted by the testimony of a nonexpert witness.

"In *Hines* v. *Industrial Acc. Com.*, 215 Cal. 177 [8 P.2d 1021], the uncontradicted testimony of a physician concerning the cause of a physical disability was said to be conclusive. In *Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 140 Cal.App. 482 [35 P.2d 366], an award of compensation for an alleged injury was annulled because, in the opinion of the physicians who testified, the appellant's disability had not been caused by his employment, and the expert evidence was held to be conclusive upon the question. It is clear that there is nothing in these cases or the Simpson case which supports the contentions of the defendant that the medical evidence presented on his behalf must be accepted as conclusive."

Petitioner relies upon such cases as *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 47 Cal.App.2d 494 [118 P.2d 334], *Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 140 Cal.App. 482 [35 P.2d 366], and *William Simpson C. Co.* v. *Industrial Acc. Com.*, 74 Cal.App. 239 [240 P. 58], as requiring in certain cases expert testimony to support certain scientific or medical conclusions of the commission. But even if we should assume that the extent of loss of grasping power must be determined by experts (which we do not), yet when there are, as here, several experts giving divergent views of the degree of impairment, coupled with the possibility of lack of cooperation by the patient, we see no reason why the commission may not choose a degree that is not precisely in accord with any of the experts as long as it is within the range of their testimony.

In any event it should be obvious that the loss of gripping strength of the hand is not a subjective condition that requires scientific proof. Certainly the injured person may testify to the extent of his disability and the commission is fully qualified to determine the question from all of the evidence. We are not dealing with the question of the subjective scientific cause of an injury. It is clear that the injury caused the disability. The issue is only the extent of that disability. Various analogous situations have been presented and it has been held that testimony by a lay witness is proper to show the immediate consequences of an injury received by him (*Bland* v. *Southern Pac. Co.*, 65 Cal. 626 [4 P. 672] ; *Herman* v. *Glasscock*, 68 Cal.App.2d 98 [155 P.2d 912] ), that the plaintiff believed he would be a permanent invalid (*Boa* v. *San Francisco-Oakland T. Rys.*, 182 Cal. 93 [187 P. 2] ; *Jones* v. *Key*, 54 Cal.App. 677 [202 P. 478] ), and the

nature of the injuries received (*Latky* v. *Wolfe*, 85 Cal.App. 332 [259 P. 470]; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 47 Cal.App.2d 494 [118 P.2d 334].) (See, also, 10 Cal.Jur. 995 et seq.)

The award is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.