[Civ. No. 14991. First Dist., Div. One. Dec. 31, 1951.]

NEW AMSTERDAM CASUALTY COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

504

Mullen & Filippi for Petitioner.

Edmund J. Thomas, Jr., T. Groezinger and Alvin L. Dove for Respondents.

WOOD (Fred B.), J.—This is a proceeding upon application of the workmen's compensation insurance carrier to review a decision of the Industrial Accident Commission which determined that an employee had a permanent disability of 84 per cent.

The commission found that the temporary disability payments previously awarded ($2,275.60) exceeded 25 per cent of the permanent disability award ($3,400.83, the aggregate of the 240 weekly payments), thereby reducing the 240 weekly payments by 25 per cent but not reducing the life pension weekly payments. The commission ordered the disability payments to commence as of the same date that the temporary disability payments had commenced (February 3, 1947, eight days after the injury), not upon termination of the period of payment of the temporary disability.

Petitioner claims (1) the finding of 84 per cent permanent disability is not supported by the evidence; (2) it was error to award permanent disability payments for a period during which temporary disability payments were made; and (3) the law requires a 25 per cent reduction of the life pension as well as the weekly payments.

(1) *The percentage of total permanent disability* sustained by an employee presents a question of fact. The commission's decision thereon ''is not subject to review by the

courts unless palpably contrary to the undisputed evidence." (*Frankfort General Ins. Co.* v. *Pillsbury*, 173 Cal. 56, 59 [159 P. 150].) A court has "no power to disturb such action provided there was any evidence before the Commission to justify such a finding." (*Ford Motor Co.* v. *Industrial Acc. Com.*, 202 Cal. 459, 464 [261 P. 466].) ██ In this case, the determination of 84 per cent disability was based upon these findings: "Said applicant was a waitress, 46 years of age, and said injury caused permanent disability consisting of limited motion of spine, *tips of fingers failing to touch floor on forward bending by 20"*; 80 per cent limitation of backward bending with pain; two-thirds limitation of lateral bending with discomfort; discomfort in lumbar region on rotation; slight spasm of muscles; tenderness of lumbar muscles; slight discomfort on rocking and jarring; aching pain in lumbosacral region radiating to gluteal region, both thighs and legs to ankle, worse on right, with some increased discomfort when cold and on lifting; necessity of wearing belt; inability to do other than light work; *approximately 10% reduction of grasping power of both hands.*" (Italics added, to indicate the findings which petitioner questions.)

The evidence and the reasonable inferences which may be drawn therefrom support the questioned findings.

Dr. Keene O. Haldeman, in his report of October 25, 1949 said: "On forward flexion, standing with knees straight, the fingertips come 20 inches from the floor with pain in the lower back and right buttock . . ." Dr. Forest E. Fleming reported, September 20, 1950, that "Upon forward bending the fingers fail the floor by 20". This maneuver is accomplished with some difficulty and with the complaint of pain in the lumbar region."

June 14, 1949, Dr. Nels W. Ahnlund reported, *inter alia*: "pain in the right arm, which hurts only on use. When it is painful she has no power of grip," and commented: "We have reviewed Mrs. Anson's history with the reports submitted of Dr. Staub, Dr. Moore, Dr. Cox, Dr. Parker, Dr. Ryan, and Dr. Towne. The essential findings that I can gather from these reports and with which I am in agreement, are that this woman does not appear to be exaggerating her complaints." The employee testified that there is a weakness and pain through her arms when she uses them; that she first noticed these pains when she tried to work after her injury (a period of some few months only) ; that the pain comes from her back through her arm and shoulder; that it is mostly in her right arm, a weakness there, she cannot grasp anything. ██ The testi-

mony of the employee as to her loss of grasping power is evidence on that subject. (*Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.* 33 Cal.2d 89, 93 [199 P.2d 302].) In this case, there is also Dr. Ahnlund's medical report.

As to causation, there is evidence that none of the factors of permanent disability was disabling prior to the injury. In addition, Dr. Ahnlund, in his report of July 15, 1949, after indicating difficulty in evaluating the exact amount of disability due to the injury and that due to a preexisting arthritie condition, said: "As stated in our previous report, she had done heavy laboring work and housework prior to her injury, but this was apparently the straw that broke the camel's back." In his report of November 14, 1949, he said: "I feel that it is a medical possibility that a fall such as Mrs. Anson sustained on January 27, 1949 [1947] would be enough to initiate the onset of disabling symptoms of a mixed arthritis." Dr. Haldeman, in his report of October 25, 1949, said in part as follows: "It is probable that the patient has some residual symptoms as a result of her injury of January 27th, 1947, although I do not believe that they are of sufficient severity to prevent her working." After describing various symptoms as shown by X-ray films, he said: "I am therefore not able to attribute the patient's present symptoms to arthritis of the spine or sacroiliac joint."

 *(2) Concerning the date for commencement of the permanent disability payments,* section 4650 of the Labor Code provided that "If the injury causes permanent disability, a disability payment shall be made for one week in advance as wages on the eighth day after the injury," and section 4651 of the code provided that permanent disability payments "shall thereafter be made on the employer's regular pay day but not less frequently than twice in each calendar month, unless otherwise ordered by the commission." These provisions would seem to require the commission to order commencement of the permanent disability payments in this case precisely as it did order them.

Petitioner contends that these provisions were not applicable when the employee sustained a temporary disability which later developed into a permanent disability. In this case, the commission, on March 9, 1949, found that the injury caused "temporary total disability from the date thereof [January 27, 1947] to and including February 12, 1949 and indefinitely thereafter," and retained jurisdiction "to entertain a petition for permanent disability indemnity when and

if said injury proximately causes permanent disability." December 2, 1949, petitioner gave notice of cessation of payments and requested an order terminating liability. After a hearing thereon, amended findings and award were filed March 2, 1951, in which the commission determined that the "injury caused permanent disability" of 84 per cent; ascertained the compensation payable therefor, less a credit for temporary disability already paid, and ordered payment thereof at the rate of $14.17 a week, "beginning February 3, 1947," and continuing until that amount shall have been paid, with interest, and thereafter a life pension payable at the rate of $5.23 a week.

Cessation of temporary disability payments occurred in December, 1949. The earliest indication which we have found in the record concerning a possible permanent disability appears in a report of June 14, 1949, by Dr. Ahnlund. He therein said, "If I were to care for her, I would greatly prefer that she be allowed a permanent disability rating . . ." We have not found in the record a determination of the date when the disability became permanent.

█ Petitioner correctly states that a person cannot be temporarily and permanently disabled at the same time. (*Industrial Indem. Exch.* v. *Industrial Acc. Com.*, 90 Cal.App. 2d 99 [202 P.2d 585].) █ When there is a change from a temporary to a permanent disability (as distinguished from permanent disability *ab initio*), permanent disability is regarded as a new and further disability. (*Armstrong* v. *Industrial Acc. Com.*, 219 Cal. 673 [28 P.2d 672]; *Henry Cowell L. & C. Co.* v. *Industrial Acc. Com.*, 211 Cal. 154 [294 P. 703, 72 A.L.R. 1118].) However, we are considering "payments."

█ There is no provision of the state Constitution which would prevent the Legislature from requiring that payments for a permanent disability (whether it occurs *ab initio* or as a new and further disability) commence as of the eighth day after the injury. █ That requirement, it appears, the Legislature did impose until section 4650 was amended to commence the disability payment on the eighth day after the injury becomes permanent (Stats. 1947, ch. 1033, p. 2304, at 2305). That amendment, effective in September, 1947, did not apply retroactively to an injury which occurred prior thereto.

█ *(3) Concerning the reduction of the permanent disability payments when the temporary disability payments*

*exceed 25 per cent of the former,* section 4661 of the Labor Code, as amended in 1945, is the governing statute. It then provided that where an injury causes both temporary and permanent disability the employee is not entitled to both, but only to the greater of the two· "except that where the temporary disability payment exceeds 25 per cent of the permanent disability payment the injured employee shall be paid 75 per cent of such permanent disability payment in addition to the temporary disability payment." (Stats. 1945, ch. 1335, p. 2506.)

What was the meaning of "permanent disability payment," as used in the quoted portion of section 4661? The code did not in express terms furnish a definition.

Petitioner claims that section 4658 of the Labor Code supplied it. That section prescribed a formula for computing "the disability payment." For percentages of 1 to 60 per cent of permanent disability, it prescribed from 4 to 240 weeks of payments in the amount of 65 per cent of average weekly earnings, without further payments of any kind. For percentages of 70 to 100 per cent of permanent disability, it prescribed 240 weekly payments of 65 per cent of average weekly earnings, and thereafter payments for remainder of life varying upward from 10 to 40 per cent of average weekly earnings. Section 4659 of the code supplied a formula for determining payment for permanent disability percentages intermediate to those specified in section 4658.

If section 4658 did supply the definition of "permanent disability payment," the conclusion seems inescapable that in determining the 25 per cent and the 75 per cent under section 4661, the payments for the remainder of life as well as the payments for the specified number of weeks must be taken into account when, as in this case, the permanent disability exceeds 70 per cent. Section 4658 makes no differentiation between the two types of payment save as to the amount of each. It lists them in parallel columns, prefaced with the statement: "If the injury causes permanent disability, the percentage of disability to total disability shall be determined and the *disability payment computed and allowed* according to the following schedule: . . ." (Italics added.) Furthermore, section 4700 of the code terminated the disability payment upon the death of the employee. It declared that "Any accrued and unpaid compensation shall be paid to the dependents, or, if there are no dependents, to the personal representative of the deceased employee or heirs or other

persons entitled thereto, without administration, but such *death terminates the disability.''* (Italics added.) We conclude that section 4658 did supply the definition of ''permanent disability payment'' and that the remainder of life payments as well as the specified number of weeks' payments must be taken into account in making the computation under section 4661.

In support of its use of the 240 weekly payments (to the exclusion of the life pension payments) in making the computation, respondent commission invokes the liberal interpretation policy declared in section 3202 of the Labor Code, and the absence of express legislative authority for determination of the employee's life expectancy.

■ As to interpretation in accordance with the policy expressed in section 3202, we are not convinced that the commission's interpretation is more liberal to the employee than that which we have indicated, nor do we find an ambiguity in the statute which renders section 3202 applicable.

■ Concerning ascertainment of the employee's life expectancy, the difficulty is no greater than that which confronts courts and juries in making similar computations in other situations. (See cases collected in 8 Cal.Jur. 1005-1006, § 52; 1030 and 1031, §§ 68 and 69.) An *express* legislative sanction or mandate for making such a computation is not necessary when, as in this case, the statutory formula requires it.

The award is annulled and the case is remanded for further proceedings not inconsistent with this opinion.

Peters, P. J., and Bray, J., concurred.