[Civ. No. 21197.   Second Dist., Div. Three.   Dec. 5, 1955.]

ARTIE DE LA TOVA, Petitioner, v. INDUSTRIAL
ACCIDENT COMMISSION et al., Respondents.

Louis R. Stein for Appellant.

Everett A. Corten and Edward A. Sarkisian for Respondents.

WOOD (Parker), J.—Review of proceedings of the Industrial Accident Commission.

On January 25, 1952, the petitioner, while employed as a meat packer, sustained injuries to her head and neck when she fell and struck her head on a cement floor.   The referee

found, among other things, that said injuries caused temporary total disability from January 26, to February 24, 1952, entitling applicant (petitioner herein) to $35 a week during that time; that said injuries caused temporary partial disability beginning February 25, 1952, entitling applicant to $17.50 a week based upon 50 per cent loss of earning power; and that applicant was in need of further medical treatment. An award was made in accordance with said findings. On March 25, 1953, the insurance carrier filed a request to terminate liability. Applicant did not object thereto. On May 15, 1953, an order was made terminating liability as of March 25, 1953. On September 25, 1953, applicant filed a petition to reopen, alleging therein that she had been unable to work, except sporadically, since said order was entered; and that she was in need of further medical treatment. At a hearing on March 12, 1954, the referee ordered that petitioner be reexamined by an independent medical examiner (Dr. Dueker, who had previously examined petitioner), and that his report of the examination be received in evidence; and the referee stated that thereafter the "file" might be referred to the rating bureau. Dr. Dueker made the examination and filed a report thereof in May, 1954. He stated therein that about 85 per cent of petitioner's complaints were due to a habitual static postural deviation; and that 15 per cent of her disability was a sufficient allocation to ascribe to the injury. In January, 1955, petitioner cross-examined Dr. Dueker relative to said report. Thereafter the referee instructed the rating bureau to make a permanent disability rating, and to base it on Dr. Dueker's report of May, 1954, "apportioning in accordance with the doctor's opinion." The rating bureau apportioned 15 per cent of the petitioner's disability to the injury and recommended a permanent disability rating of 7¼ per cent.

On April 4, 1955, an order was made granting the petition to reopen, and the referee made findings in part as follows: that further temporary partial disability began on August 10, 1953, and continued to March 12, 1954, entitling applicant to $17.50 a week during that time, based upon a 50 per cent loss of earning power; and that the injuries resulted in permanent disability which was rated at 7¼ per cent, entitling applicant to $30 a week for 29 weeks. An award was made in accordance with the findings. Applicant's petition for reconsideration was denied.

Petitioner contends that there was no substantial evidence

that: (1) her condition became permanent on March 12, 1954; (2) temporary disability terminated as of that date; (3) she was not in need of further medical treatment; (4) her permanent disability required apportionment because of a preexisting physical condition; (5) apportionment of the disability should be 15 per cent to the injury and 85 per cent to the preexisting condition.

In September, 1952 (about eight months after the injury, and prior to the first award), Dr. Dueker, the independent medical examiner who was appointed by the referee, examined petitioner and made a written report which was received in evidence. He stated therein, in part, that: petitioner complained of dull aching sensations in the right temple, and of a dull, heavy sensation in the posterior cervical area; she stated that she had not returned to work "for fear that her neck and head pain will recur"; she stated that medication prescribed by her doctor more or less controlled the headache; she denied previous injury or similar complaints; she seemed to be logical in her conversation and did not seem to exaggerate complaints. Dr. Dueker stated further in his report that strong cervical compression elicited mild complaint of local pain in upper posterior cervical area; he reviewed X-rays of her skull and cervical spine; he believed that her principal trouble is the residual of cervical muscle and fascial strain; petitioner had a posture marked by increased lumbar lordosis and forward carrying of the head which in itself tends to put a more or less continuous postural strain on the supporting structures of the spine; treatment consisting of heat, massage and traction, "with an honest effort" by her to rehabilitate the postural deviation, should be effective within a few weeks; her complaint "is perhaps 85% due to the static postural deviation underlying and prolonging the effects of the cervical strain due to the injury."

In the second report of Dr. Dueker, made in May, 1954, he stated that petitioner complained of heavy feeling and dull ache in the posterior neck, a feeling of tiredness in her arms, and "blackouts" which she said occurred every two or three months and sometimes caused her to fall. He stated further therein that there was moderate tenderness over the upper cervical muscles, that pressure there caused subjective complaint of pain; there is chronic cervical strain, preexistent with habitual postural alteration contributing; gentle traction or the mere correction of the cervical posture will relieve her complaint; after a careful reconsideration of her case he could not materially alter his diagnosis and comment as

stated in his first report; he would reiterate that perhaps 85 per cent of her present complaints are on the basis of the habitual static postural deviation, allowing no more than a small portion of the total picture to the effect of the injury at this time; the effects of the injury, to be termed temporary aggravation, should have cleared up in a few weeks under proper treatment; he believed that the patient had settled down to a degree of comfort acceptable to her, and the avoidance of responsibility for support of herself and son; he would allow her two months of the suggested physical therapy regime, with cooperation on her part, as a generous allowance of time for her recovery from the residual effect attributable to the accident; he believed that the 15 per cent of disability which he ascribed to the injury at the time of his first examination was a sufficient allocation.

At the hearing on January 20, 1955, for the purpose of permitting petitioner to cross-examine Dr. Dueker, he testified that petitioner had a preexisting habitual postural deviation to which he attributed 85 per cent of her present condition, and that he attributed 15 per cent of her condition to the injury; that the cervical strain should not "of itself" have created symptoms for more than two months after the injury, and that the remainder of her trouble and the prolongation of it were due to the fact that she did not correct her posture; he had no explanation for the blackouts which she referred to during his second examination in May, 1954; he was "so strongly of the opinion that all she needs to do is to cooperate with very simple treatment to get over this," that he believed a very large part of her complaints were due to the fact that she would not cooperate; he thought it probable that, without any injury, the petitioner might have had similar trouble later in life following a longer period of poor posture.

Dr. Meade, who gave petitioner medical treatment on behalf of the insurance carrier, made a report on January 28, 1952, in which he stated that the "period of disability will probably continue for another one to three weeks, depending on whether she develops post-traumatic headaches." In another report, on February 22, 1952, he stated that X-rays taken of petitioner's neck on that date were negative for fracture dislocation; her symptoms were subjective, and he informed her that she should be able to assume her occupation on February 25, 1952; she stated that she did not want to go back to the same place because another employee said things that had embarrassed her.

Dr. Dickerson, who examined petitioner on behalf of the insurance carrier, stated in a report on February 6, 1952, that petitioner's complaints were consistent with a mild cerebral concussion syndrome; she should not return to her employment for four to six weeks; and he could not see any indication of permanent disability from the injury. In a supplemental report, on May 13, 1952, Dr. Dickerson stated that at that time petitioner was fully able to do some gainful work, and he saw no reason for further treatment; she had made a good clinical recovery from the effects of the injury, and there would be no permanent disability. In a further report, on June 14, 1952, he stated that X-rays of the cervical spine were negative; in his opinion there were no objective findings in the examinations which would support the claim of continued headaches; and it was apparent that she had recovered from any ill effects of the accident.

Dr. Morgan, who examined petitioner on February 18, 1954, on behalf of the insurance carrier, made a report that petitioner had subjective complaints, and he did not believe there was any disability as a result of the injury.

A report of Dr. Shear, which was made on September 14, 1953, was attached to the petition to reopen; he stated therein that in his opinion she has a chronic cervical muscle spring; he believed that she should be reevaluated—such reevaluation to consist of electromyogram studies, rechecking X-rays and subsequent treatment by a psychiatrist if necessary.

As above stated, petitioner contends that there was no substantial evidence that her condition became permanent on March 12, 1954, or that temporary disability terminated as of that date. This contention is not sustainable. ■ "In reviewing the findings of the commission, the courts are without power to disturb them unless there is a lack of substantial evidence. The courts are not concerned with conflicts. . . . Where there is substantial evidence to support the findings and order of the commission, the reviewing court may not substitute its views for those of the commission and annul the award. . . . If the findings of the Industrial Accident Commission are supported by inferences which may fairly be drawn from evidence, even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award. . . ." (*Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410, 422-423 [139 P.2d 892]; *Pacific Elec. Ry. Co.* v. *Industrial Acc. Com.*, 96 Cal.App.2d 651, 660 [216 P.2d 135].) Dr. Dueker stated that treatment, with an honest effort by petitioner to rehabilitate the postural

deviation, should be effective within a few weeks; about 85 per cent of her complaints were "on the basis of the habitual static postural deviation"; he believed that she had settled down to a degree of comfort acceptable to her; the cervical strain should not of itself have created symptoms for more than two months after the injury; the remainder of her trouble was due to her poor posture and her failure to cooperate in treatments to correct posture. Dr. Dickerson stated that in his opinion there were no objective findings which would support her claim of continued headaches, and that she had recovered from any ill effects of the accident. Dr. Morgan stated that he did not believe there was any disability as a result of the injury. The referee found that the injury caused temporary partial disability from February 25, 1952, to March 25, 1953, and from August 10, 1953, to March 12, 1954; and that it resulted in a permanent disability of petitioner. Those findings are supported by substantial evidence.

■ As above shown, petitioner contends further that there was no substantial evidence that she was not in need of further medical treatment. She refers to Dr. Dueker's report of May, 1954, wherein he suggested a physical therapy regime for two months, including the cooperation of petitioner. At the hearing in January, 1955 (about eight months later), he testified that the cervical strain should not "of itself" have created symptoms for more than two months after the injury; and that the remainder of petitioner's trouble was due to the fact that she did not correct her posture. Also, Dr. Dickerson stated in his report of May, 1952, that he saw no reason for further treatment; and in his report of June, 1952, that it was apparent that petitioner had recovered from any ill effects of the accident. The finding that petitioner was not in need of further medical treatment (as a result of the injury) was supported by substantial evidence.

■ Petitioner contends further, as above shown, that there was no substantial evidence that her permanent disability required apportionment by reason of a preexisting postural defect. She argues that there was no evidence that her postural defect, which had existed prior to the accident, had caused her any discomfort prior to the injury, or that it was progressing to a point which could with reasonable certainty produce disability without an injury. She argues further that an employer takes an employee in the physical condition in which he finds the employee and that the fact

that petitioner's posture contributed to prolonging the effects of the injury does not justify an apportionment. Section 4663 of the Labor Code provides: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributed to the injury." Compensation is recoverable for "disability which results from the aggravation or 'lighting up' of a preexisting disease if the aggravation or 'lighting up' is reasonably attributable to the accident; but compensation is not recoverable for disability which results, irrespective of the accident, from the normal progress or development of a preexisting disease. [Citations.] It was a question of fact for the determination of the commission as to whether applicant's permanent disability resulted from the effects of the accident, including the aggravating effect of the accident upon a preexisting disease, or whether the disability or a part thereof resulted from the normal progress of a preexisting disease. If a part of the disability resulted from the normal progress of a preexisting disease then a portion of the permanent disability rating herein should have been attributed to the preexisting disease." (*Industrial Indem. Co.* v. *Industrial Acc. Com.*, 95 Cal.App.2d 443, 449-450 [213 P.2d 11].) The opinion of Dr. Dueker, specifically referred to above, was a sufficient basis for a determination that a part of petitioner's disability resulted from the normal progress of her preexisting condition. There was substantial evidence in support of apportionment of the disability.

█ Petitioner contends further that there is no substantial evidence to justify the apportionment of 15 per cent of her disability to the injury. She argues that Dr. Dueker was unable to give any basis for his opinion that 15 per cent of her disability was due to the injury. At the hearing in January, 1955, counsel for petitioner asked Dr. Dueker to explain how he arrived at the percentage of apportionment, and Dr. Dueker replied that he believed "by far the greater proportion" of her disability was due to her poor posture and failure to correct it "as against a minor portion due to the injury and that comes up with a figure for 85 and 15 respectively"; and that there was no objective rule whereby his opinion could be tested—that it was "a matter of trying to evaluate the whole picture and striking a fair arbitrary apportionment." Prior to said hearing, as above shown, Dr. Dueker made two physical examinations of petitioner— one about eight months after the injury and the other about

two years and four months after the injury. He reviewed her history, and examined X-rays of her skull and cervical spine. In his opinion, as above stated, the cervical strain should not have created symptoms for more than two months; she had settled down to a degree of comfort acceptable to her; and a large part of her complaints were due to the fact that she did not cooperate. In *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal.2d 89 [199 P.2d 302], it was said at pages 93 and 94: "Arriving at a decision on the exact degree of disability is a difficult task under the most favorable circumstances. It necessarily involves some measure of conjecture and compromise by the finder of fact as certainly would occur in the mental processes of a so-called expert witness. When the commission is confronted with widely divergent views as to the extent of the loss of function of the body, further complicated by the possibility of lack of cooperation or faking in various degrees by the injured person, it may make a determination within the range of the evidence as to the degree of disability. . . . The trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence." In *Tanenbaum* v. *Industrial Acc. Com.*, 4 Cal.2d 615 [52 P.2d 215], it was said at page 618: "[T]he determination of the percentage of disability is a matter left to the sound discretion of the commission." In the present case, it cannot be said that the commission abused its discretion in apportioning 15 per cent of the disability to the injury.

The award is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied February 1, 1956.