[Civ. No. 17296.   Second Dist., Div. Three.   Dec. 30, 1949.]

INDUSTRIAL INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMIS- SION and EDWARD A. THOMAS, Respondents.

Herlihy & Herlihy for Petitioner.

T. Groezinger and Robert Ball for Respondents.

WOOD, J.—Review of proceedings of the Industrial Accident Commission. An award was made, based upon a permanent disability rating of 55½ per cent. Petitioner herein, which is the compensation insurance carrier for the employer, asserts that one-half of that disability rating should have been apportioned to preexisting or independently developing arthritis.

On April 28, 1945, Edward A. Thomas, an employee of the United Concrete Pipe Corporation, was injured while he, as a welder foreman, was inspecting work that had been done in the engine room of a ship. In order to go to a certain place which he intended to inspect, it was necessary that he walk upon a "2 x 12" board—one end of which rested on the top of an engine and the other end rested on some object on the side of the room. The board was 26 feet above the floor. Above the board and under the deck, there was an angle-iron, known as a deck stiffener, which extended across the room. Mr. Thomas was holding onto the deck stiffener as he started to walk upon the board. When he stepped on the board it fell to the floor of the engine room, and then he, in order to avoid falling to the floor himself, hung to the deck stiffener with his left hand for a moment, and then he "hand-over-handed" along the deck stiffener for a distance of 20 feet to a place of safety at the side of the room. His weight was 265 pounds. He felt no discomfort at that time (about noon), and he continued to work but in the evening he noticed a little stiffness

in both shoulders and arms and in the base of his neck, and about midnight he had pain therein. He did not return to work until June 10, 1945. During the time he was not working he was furnished medical treatment and was paid temporary disability compensation by the petitioner. About one week after he returned to work he was discharged.

Thereafter he obtained employment at a welding company, but after two weeks he quit that employment because, according to his testimony, the condition of his hands and arms was such that he could not do the work. He testified that during that time when he put a strain on his hands and arms they became numb and ached and that the ache extended through both shoulders. Thereafter for about five months he worked for himself manufacturing fishing tackle, but he earned only enough money to get something to eat. In the latter part of November, 1945, he was employed as a musician at $76 a week (he had been a musician before the war), but he did not get along very well because, according to his testimony, he no longer had "facility" in his fingers and there was impairment of flexibility in his fingers. He continued with that work until July, 1946, when his employer told him that "he could not make the grade." Thereafter he worked for himself manufacturing fishing tackle until November, 1947, during which time he earned about $150 a month. Then he was employed by a company which manufactured fishing tackle and he earned $40 a week.

Mr. Thomas filed his application for adjustment of his claim on August 30, 1948. The hearing of the application was had on September 23, 1948.

Mr. Thomas testified further that he never had any other injuries to his shoulders or arms; about six months after the accident involved here the employer herein (United Concrete Pipe Corporation) told Mr. Thomas' wife by telephone that it was no longer liable for medical treatment and that it was through with the accident because there was a sedimentation rate in his blood and that was the cause of his trouble; he had obtained and paid for medical treatment on his own account from Dr. Blunden, who sent him to the Good Samaritan Hospital and St. Vincent's Hospital for X-ray irradiation through both shoulders, which treatments continued over a period of 90 days; he has had numbness in his hands and arms since the accident whenever he used his hands in a rigid or stationary position while supporting a weight; he has a severe

pain in his forearms, upper arms and shoulders when he lifts or holds anything of any weight; after releasing such hold he can relieve the pain by shaking his hands; he has no discomfort when he is very warm; the pain is sharper in cool weather; the function of his shoulders is impaired; pain on the right side is greater than it is on the left side because he uses his right arm more; and he has been seeing Dr. Blunden continuously since July 4, 1948, when he had a severe attack.

He was examined by Dr. Lee, the employer's physician, on May 7, 1945, who reported that the injury was a partial tear or strain of infra-spinatus tendon of the left shoulder; he estimated the period of treatment as six or eight weeks and the period of total disability as two or three weeks.

On May 22, 1945, Dr. Schroeder, the employer's physician, examined him and reported that he continues to have severe pain of a nagging character in his shoulders, that slow improvement continues, that there should be further treatment for six weeks, and there is no permanent disability.

Dr. Chipman, the insurance carrier's physician, examined him on May 31, 1945, and reported that he is apparently suffering from a strain to the muscles of the left shoulder and arm, that disability would continue another two or three weeks, that daily physiotherapy and exercises at his office were instituted, and there should be no permanent disability. Dr. Chipman examined him again on June 26, 1945, and reported that the patient has a definite leucocytosis and increased sedimentation rate indicative of some systemic local infection, and it is possible that the pain through the left shoulder and arm is caused by this systemic toxemia; there is nothing in the examination that substantiates his complaints; the patient is able to return to any type of work; that treatments should be directed to the clearing up of any systemic infection.

Dr. Feldman, the insurance carrier's physician, examined him on July 24, 1945, and reported that there is evidence of some hypertrophic arthritis on some of the cervical vertebrae and some calcific deposit in the tip of the spinous process, which is of no clinical significance; that the patient may have suffered some strain about the scapular muscles on both sides and there may have been some nerve root irritation; he has an increased sedimentation rate which indicates some systemic factor—arthritis; if he suffered any sprain he has recovered; he did not believe that the patient is disabled, and he believed that work should be beneficial.

Dr. Blunden, the applicant's physician who is an orthopedic surgeon, made a report on September 14, 1948, which stated as follows: He examined the patient in the first part of April, 1946, and thereafter in that month he treated him four times. He examined him again on July 16, 1948, and thereafter treated him six times. The patient obtained some relief from the treatments, but there remains a very considerable residue of pain, tenderness and disability. He has not been free from symptoms during the two and one-half years' period. In Dr. Blunden's opinion the difficulty "is probably related to the trauma which he describes in his original history—that is for a man of Mr. Thomas's weight to hang from one arm for any period of time would impose an extremely severe stress on his shoulder joints and it is entirely within the realm of possibility that a small tear could have resulted." Arthritic changes in the acromioclavicular joint are the very common cause of constant pain of the type this patient has experienced, and "Certainly such a condition could be caused by severe stress and strain, which could have been produced by the original injury or there could have been a pre-existing irritation or degeneration of the acromioclavicular joint with superimposed trauma to aggravate and promote the arthritic process which is apparently present." That the patient's condition is "due at least, in part, to his original injury as described in his history, if not entirely so." That "[i]t seems to me that this is either a condition caused by the trauma of being forced to hang on by his arms for a period of minutes or it is the result of the described trauma being superimposed on a pre-existing degenerative changes. In view of Mr. Thomas' age and his general health and vigor, I am inclined toward the former explanation." (At the time of the accident Mr. Thomas was 42 years of age.)

Dr. Johnson, a physician who examined Mr. Thomas on September 17, 1948, at the request of the attorneys for the employer, stated in his report that it is difficult for him to visualize how the patient could have in any way injured his shoulders; that he has arthritic changes involving both shoulders, and the arthritis antedates the incident; that the increased sedimentation rate, found by physicians who saw the patient shortly after the incident, is in keeping with the arthritic condition and "thus rules out the possibility of this case being occupational in origin"; and the vague sensory complaints he gives were not verified by the clinical findings.

Dr. Lee stated in a letter of September 25, 1948, that during the treatments of the patient in 1945 at the offices of Drs. Stellar, Schroeder & Lee (physicians for the employer) the patient made no complaint regarding his right shoulder.

Dr. Chipman (physician for the employer) stated in a letter of September 28, 1948, that during the visits of the patient to his office in 1945 the patient made no complaint regarding his right arm or shoulder.

Dr. Beddoe, assistant medical director of the Industrial Accident Commission, stated in his report of October 11, 1948, that the patient's disability had reached a permanent and stationary status and that no further treatment is indicated; and the factors of permanent disability are loss of grip in right hand and subjective sensations. In his supplemental report of November 23, 1948, he stated that the X-rays of both shoulders show a degenerative arthritis, but since the patient had no pain or discomfort in either shoulder prior to the accident and had pain and discomfort in both shoulders immediately subsequent to the accident, "it is my opinion that an aggravation of a pre-existing arthritis took place at the time of the injury sustained in April 1945, resulting in the present subjective sensations of the patient."

After Dr. Beddoe's supplemental report had been filed, the petitioner herein requested that he answer certain interrogatories, one of which was as follows: "If it be assumed that the applicant had no complaints in regard to his right shoulder while under the treatment of Drs. Lee and Chipman, is it true that the osteoarthritis and complaints in the upper extremity which he now has, developed independently of his injury of April 28, 1945?" Dr. Beddoe answered that question as follows: "I do not consider that the osteoarthritis in his right shoulder was caused by the injury, but, in my opinion, it was aggravated thereby, in so much as there was trauma to both shoulders at the time of the injury under consideration." Another of said interrogatories was as follows: "How much of the applicant's present disability is due to pre-existing or independently developing arthritis, as distinguished from the effects of his injury of April 28, 1945?" Dr. Beddoe answered: "About 50%."

The referee requested the permanent disability rating bureau of the commission to give the referee the disability rating of the applicant, based upon the report and supplemental report of Dr. Beddoe. In making that request he stated to the bureau: "[I]n view of fact that there had

never been any prior complaints of upper extremity I do not intend to apportion and therefore ask specifically in figuring this rating, you ignore pre-existing arthritic process." The bureau replied that the permanent disability rating is "55½% —equivalent to 222 weeks of disability payments." The petitioner was given an opportunity, upon its request, to cross-examine the rating specialist. He testified, upon such examination, that in accordance with instructions from the referee, he merely rated the disability described in Dr. Beddoe's two reports, and he "did not undertake to apportion any part of the disability to pre-existing trouble or to this particular injury."

The commission found, among other things, that applicant's injury caused a permanent disability of 55½ per cent entitling him to $25 a week for 222 weeks in the total sum of $5,500. (The amount of $125 paid for temporary disability was deducted therefrom.) An award was made accordingly.

The employer petitioned for a rehearing upon the ground, principally, that the permanent disability award of 55½ per cent is based upon applicant's entire disability without any apportionment as between the injury and the pre-existing condition. The referee, in his report on the petition for rehearing, stated that the foundation for not making an apportionment is to be found in the record where the applicant testified that he never had any prior injuries to, or prior complaints regarding, either of his upper extremities.

As above stated, petitioner asserts that one-half of the permanent disability rating of 55½ per cent should have been apportioned to preexisting or independently developing arthritis. It is not asserted here that said rating of 55½ per cent is not a correct evaluation of the extent of applicant's disability. Section 4663 of the Labor Code provides: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of disability due to the aggravation of such prior disease which is reasonably attributed to the injury." ▆ Compensation is recoverable for disability which results from the aggravation or "lighting up" of a preexisting disease if the aggravation or "lighting up" is reasonably attributable to the accident; but compensation is not recoverable for disability which results, irrespective of the accident, from the normal progress or development of a preexisting disease. (See *Tanen-*

*baum* v. *Industrial Acc. Com.*, 4 Cal.2d 615, 617 [52 P.2d 215] ; *Colonial Ins. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 79, 83, 84 [172 P.2d 884].)  ■ It was a question of fact for the determination of the commission as to whether applicant's permanent disability resulted from the effects of the accident, including the aggravating effect of the accident upon a preexisting disease, or whether the disability or a part thereof resulted from the normal progress of a preexisting disease. If a part of the disability resulted from the normal progress of a preexisting disease then a portion of the permanent disability rating herein should have been attributed to the preexisting disease. The question therefore is whether there was substantial evidence to support the determination of the commission that there should be no apportionment.

■ It is true that five physicians, who examined the applicant at the request of petitioner, stated in effect that the accident herein did not cause, and could not have caused, any of the permanent disability of applicant, and that the disability was due to arthritis which was neither caused nor aggravated by the injury. However, the applicant's physician, Dr. Blunden, stated (in the last paragraph of his report) that applicant's condition is either a condition caused by the trauma or it is the result of the trauma being superimposed on a preexisting degenerative change; and that in view of applicant's age, general health, and vigor, he was inclined toward the former explanation. Petitioner argues that Dr. Blunden did not attempt to express a positive opinion one way or the other regarding the cause of disability, and therefore his report was a guess or conjecture and was of no probative value. Petitioner cites *Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 140 Cal.App. 482 [35 P.2d 366], wherein it was stated that no expert witness has expressed an opinion that it is even reasonably probable that the condition of the applicant therein was due to his employment and an award may not be predicated upon a possibility which is merely conjecture. The last part of Dr. Blunden's statement, namely, ''I am inclined toward the former explanation,'' when considered with another part of his report wherein he states that applicant's difficulty is probably related to the trauma, is in effect a statement that he is of the belief or opinion that the condition was caused by the trauma. One meaning of the word ''incline,'' as stated in Webster's Dictionary, is ''to favor an opinion.'' In *Travelers Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal.2d 685 [203 P.2d 747], a physician testified on direct exam-

ination, regarding the cause of a death, that "there is a probability that he was suffering from lead poisoning [an injury arising out of the employment]." On cross-examination therein, he testified that perhaps the poisoning was a possibility and not necessarily a probability. The court stated therein that intellectual integrity often compels an honest physician to state that his diagnosis does not rest upon scientific certainty; and that, in reading the testimony as a whole, it was the physician's opinion that lead poisoning could not be ruled out as a contributing cause of death; and that his testimony reasonably tended to support a finding of industrial causation, and "the use of the word 'possible' under cross-examination after his expression of opinion that the disease was probable does not require the rejection of such testimony as supporting, with other evidence, the award." Petitioner asserts in effect that the case just referred to is to be distinguished from the present case in that the physician therein testified that the death was probably due to the employment, whereas in the present case the physician never expressed any opinion regarding probability. It is to be noted, however, that Dr. Blunden's report did include an expression of his opinion regarding probability. In another part of his report (in a paragraph preceding the one just discussed herein), he states as follows: "It is my opinion that the difficulty on Mr. Thomas's part, is probably related to the trauma which he describes in his original history—that is for a man of Mr. Thomas's weight to hang from one arm. . . ." It therefore appears that the report was reasonably susceptible of the interpretation that Dr. Blunden was of the opinion that applicant's condition was probably caused by the trauma. Even if he had not stated that he was inclined toward the explanation that the disability was caused by the trauma, his statement, in the alternative, that it seemed to him that the condition was caused either by the trauma or by the trauma being superimposed on a preexisting disease, was a legally sufficient medical opinion to justify nonapportionment of the disability rating.

Also, as above stated, Dr. Beddoe, the assistant medical director of the commission, stated in his supplemental report that in his opinion an aggravation of a preexisting arthritis took place at the time of the injury, resulting in the present subjective sensations of the applicant. In his answer to one of the interrogatories regarding applicant's right shoulder, he

stated that in his opinion arthritis in the right shoulder was aggravated by the injury insomuch as there was trauma in both shoulders at the time of the injury. It appears therefore that, irrespective of the report of Dr. Blunden, the medical evidence, as shown by the report of Dr. Beddoe, was sufficient to support the finding that some disability resulted from an aggravation of preexisting arthritis. ■ Petitioner asserts that Dr. Beddoe's report was the only competent evidence connecting the applicant's disability with his injury and that said report did not show that the disability was 55½ per cent but that it was one-half of 55½ per cent. That assertion is based upon Dr. Beddoe's answer to an interrogatory, which interrogatory was as follows: ''How much of the applicant's present disability is due to pre-existing or independently developing arthritis, as distinguished from the effects of his injury of April 28, 1945?'' His answer was: ''About 50%.'' It argues in effect that the answer meant that 50 per cent of applicant's present disability is due to the normal progress of the preexisting arthritis and 50 per cent is due to the effects of the injury including the aggravating effect of the injury upon the preexisting arthritis. The commission was not required to place that interpretation upon the answer. The question did not mention aggravation of preexisting arthritis. Since disability which is due to the aggravating effect of an industrial injury upon a preexisting disease is to be included in determining the full amount of disability due to the injury, the commission might have interpreted the answer of its assistant medical director to mean that 50 per cent of the disability was due to the aggravation of the preexisting arthritis as distinguished from the portion of disability attributable to the injury itself not including such aggravation.

■ Furthermore, the applicant testified in effect that prior to the injury herein he had not had any shoulder or arm injury, and he had not experienced any discomfort or pain in his upper extremities. The evidence was sufficient to support a finding that the accident aggravated preexisting arthritis which, prior to the accident, was nonsymptomatic, nondisabling, and dormant. It would seem that if the arthritis had been symptomatic at the time of the accident, it would have been impossible for the applicant to have performed the difficult acrobatic feat of going hand-over-hand for a distance of 20 feet. There was substantial evidence to support the determination of the commission that there should be no apportionment of the disability rating.

Respondent commission makes the contention that this court does not have jurisdiction to review the proceedings in this matter for the alleged reason that the petition for the writ of review was not filed within 30 days after the petition for a rehearing was denied by the commission on July 13, 1949. It appears from the filing stamp on the petition for the writ of review that the petition was filed on August 13, 1949. This court, upon motion of petitioner, made an order on September 19, 1949, that said petition be filed *nunc pro tunc* as of August 12, 1949. The reason for such order was that the petition actually was deposited for filing in the office of the clerk of this court on August 12, 1949, between 4 p. m. and 5 p. m., and the clerk did not stamp the petition with his August 13, 1949. Since, as a matter of fact, the petition was deposited with the clerk for filing on August 12, 1949, it filing stamp on that date, but he stamped it the next morning, should be deemed that the petition was filed on August 12, 1949, and therefore that it was filed within proper time.

The award is affirmed.

Vallée, J., concurred.

Shinn, P. J., concurred in the judgment.

A petition for a rehearing was denied January 18, 1950.