[Civ. No. 4477.   Fourth Dist.   Nov. 26, 1952.]

GOODWILL INDUSTRIES OF SAN BERNARDINO AND RIVERSIDE COUNTIES, INC. (a Corporation) et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and MARGARET HARRIS, Respondents.

Herbert S. McCartney for Petitioners.

Edmund J. Thomas, Jr., for Respondents.

MUSSELL, J.—Respondent, Mary M. Harris, aged 25 years, while employed as a saleslady by the Goodwill Industries of San Bernardino and Riverside Counties, Inc., on December 12, 1949, at San Bernardino, fell from a short stepladder, landing in a sitting position and striking her right hip.

The Fidelity and Casualty Company of New York was the employer's compensation insurance carrier at the time the accident occurred and both the employer and employee were subject to the provisions of the Workmen's Compensation Insurance and Safety laws of the State of California.

On December 11, 1950, Mrs. Harris filed an application with the Industrial Accident Commission for adjustment of her claim for injuries sustained, and after several hearings were had thereon, the commission found that the applicant, on December 12, 1949, sustained injuries arising out of and occurring in the course of her employment, consisting of aggravation of preexisting, quiescent tuberculosis, resulting in com-

plete paralysis of both legs, resulting in permanent disability; that said injury of December 12th caused temporary total disability beginning two days later and that said injury constitutes permanent disability of 100 per cent. An award was made against the Fidelity and Casualty Company of the sum of $16.06 per week beginning December 14, 1949, to and including June 15, 1951, as temporary disability indemnity, together with the sum of $16.06 per week for 400 weeks, as permanent disability indemnity beginning January 23, 1951, and thereafter $9.88 per week for the balance of her life.

Petitioners concede "complete paralysis of both legs is a 100 per cent disability and that the applicant may be entitled to permanent disability benefits under the provisions of section 4751 of the Labor Code. However, the Fidelity and Casualty Company claims that if it is liable at all for any of such benefits, it is liable only for the "increase of the factors of disability produced by the tuberculosis of the spine after the percentage of such original factors are properly determined and deducted from the combined disability." The commission found as a fact "that defendant is not entitled .to apportionment of any of the benefits herein allowed."

The principal question to be here decided is whether the findings and award are sufficiently supported by the evidence.

According to the records of the Texas Scottish Rite Hospital for Crippled Children, Mary Harris was born February 28, 1924, and first became seriously ill at the age of 3 years. Before she was 6 years old, she was found to have tuberculosis of the spine, with complete destruction of the first lumbar vertebra and kyphosis (forward angulation of the spine) in the lumbo dorsal region. She was placed on a "Girard Frame" and remained on it continuously for three ond one-half years, by which time there was 50 per cent destruction of the second lumbar vertebra. A back brace was then made for her which she wore, when up, with crutches under both arms. By November, 1933, there was a destruction involvement of the twelfth dorsal vertebra and marked kyphosis. Surgery was performed in which seven vertebrae were fused. Subsequent X rays, from 1934, to 1942, showed solid fusion but during all of that period she had serious complaints of pain and other symptoms, not only in the area of the kyphos and fusion, but in all areas of her back and both legs. At the age of 15 applicant lifted something and had disability for approximately two months. In January, 1941, applicant complained of some pain in the lower lumbar area just below the fused area and the X ray

examination showed two medium sized calcified abscesses on either side of the spine. The reapplication of a heavily stayed corset for a few weeks until the muscles could be rebuilt was recommended and the patient was discharged permanently. The following week applicant was readmitted to the hospital and complained of progressive pain in her back, legs and stomach. She was again put on a frame and on January 24th, a lumbar puncture was made. In September, 1941, she was fitted with a brace and told to return to the hospital in six months. In May, 1942, the fusion area clinically was firm but there was tenderness below the lower level of fusion. The left knee jerk was hypoactive, and other deep reflexes hyperactive. It was then recommended that applicant be transferred to another hospital in Texas for further care.

The applicant stated to a Dr. Crowe (in April, 1950) that following the spinal puncture in 1941 her left leg became paralyzed and was anesthetic as far as the hip so that pins could be stuck through the leg without producing any pain; that this paralysis of the leg lasted for many months; that following her marriage in 1943, she suffered from one therapeutic abortion and two miscarriages and subsequently pelvic surgery because of the fact that it was felt inadvisable for her to have a pregnancy with the severe degree of kyphosis at the region of the old Pott's disease.

Applicant testified that after the surgery in 1944 she did not limp and that she and her husband would go dancing, roller skating, horseback riding, swimming and mountain hiking and that the day preceding the accident, she had been on a mountain hike.

The record shows that Dr. James Carmack first saw Mrs. Harris on December 5, 1949, when she came to him as a private patient. She then recited a long history of trouble with her spine which had required long hospitalization and ultimate surgical fusion, at the age of 9 years. She indicated that she recently had been having some slight pain and some numbness involving the left leg and wanted check X rays of her spine. The X rays were made and the doctor saw her again on December 16th, at which time she complained of a severe pain in her back. She was treated with heat and massage through December and on January 5, 1950, still complained of some pain. The doctor's diagnosis was "low back strain." On February 5, 1950, Dr. Carmack reported that the patient still had symptoms of acute strain and walked with a considerable limp. A plaster jacket was applied and on February

23d the patient was placed on a Bradford Frame and views of the lumbar spine were taken. These views were interpreted as being negative for evidence of fracture or dislocation. Mrs. Harris reported to Dr. Carmack on May 15th, 25th and June 1st, 1950, and his report, dated June 2d, states that in his opinion Mrs. Harris, to begin with, had an acute low back sprain and had not recovered from it. Mrs. Harris was then treated regularly by Dr. Carmack until September 14, 1950, and on September 28th, the doctor reported that in view of the patient's past history and in view of the rather minor nature of her injury, he was inclined to feel that he was dealing with some other element than the simple injury itself. He referred Mrs. Harris to Drs. Girard, Loiselle and Payne of Dallas, Texas, and their report, dated September 26, 1950, made after a review of the case and further examination, sets forth the opinion that the condition of the patient was ''a flare up of the previous condition secondary to the injury.''

Dr. Crowe, an orthopaedic surgeon, stated in his report of April 7, 1950, that he and Dr. Jones examined Mrs. Harris on April 4th and found that she had a constant rhythmic kicking of the left lower extremity and the right lower extremity in a position of marked flexion. She was able to turn herself in bed without help and up to the day before, had been walking and getting about without apparent particular difficulty. Dr. Crowe's diagnosis was ''old Pott's disease now arrested with severe deformity. No injury. Hysteria,'' and it was his opinion that Mrs. Harris was a healthy woman and had not been injured in any way by the fall which she had on December 12, 1949.

Dr. Jones, in his report, dated April 10, 1950, stated that Mrs. Harris' past history readily indicated that she had a profound Pott's disease or tuberculosis of the spine from early childhood, with a very marked deformity in her low back throughout all of her adult years and that a review of her recent X rays of the spine demonstrated no evidence of activity or any destruction of the vertebrae; that there was no satisfactory evidence of any new physical disability other than the old preexisting tuberculosis of the spine which was aprently fairly well healed and then inactive.

On December 21, 1950, a laminectomy was performed on Mrs. Harris by Dr. Neufield and Dr. Vogle and some tissue was removed. The area of the bone in the region of the kyphos was found to be intact as far as the previous function was concerned. Acid fast stains did not reveal tuberculosis organ-

isms and the diagnosis was "tuberculosis of a vertebra." Dr. Neufield, in his report of April 11, 1951, stated as follows: "It is my opinion that this patient had sufficient evidence at the time that she was seen by us to justify the diagnosis of cord irritation due to the limited dural space, incurred at the time that she fell in a sitting position on December 12, 1949. Had it not been for the angulation at that level I doubt very much that the injury which the patient sustained at that time would have produced the present clinical picture. The tuberculosis material in the bodies was sufficiently soft so that a blow, the result of a fall, would be of sufficient severity to produce compression of the cord and possibly aggravate the tuberculous lesion. The aggravation of the tuberculous lesion is presumptive and problematical since there was very little evidence of this at the time of surgery."

Dr. Nickel, in his report of December 7, 1950, stated that he and Dr. Neufield were unable to determine whether the spinal cord involved represented a posttraumatic reactivation of the tuberculous process of the lumbodorsal spine or a posttraumatic mechanical impingement and that they were inclined to believe that there was a posttraumatic mechanical damage to the spinal cord resulting from the accident of December 12, 1949.

Dr. Rand, an independent medical examiner appointed by the referee, in his report of June 15, 1951, after a review of the history of the case and an examination of the patient, gave his opinion as follows: "As near as I can judge, this patient has been a victim of tuberculosis of the spine since about three or four years of age. Under long treatment, together with bone grafting, the condition had apparently become quiescent, so that she was quite active. I think the fall on December 12, 1949, reactivated the tuberculous trouble in her spine, which has led to a train of symptoms as described above. She is totally disabled at present and as near as I can judge, this disability will continue indefinitely."

Petitioners argue that "Wherever, as here, the previous impairment was to the same part, or parts, of the human body, as later became involved in an industrial injury, the extent of the preexisting impairment, and the mathematically computed degree of each preexisting permanent disability, must be deducted from the percentage of all disability in the affected part, or parts, of the body after the second injury;" that if injury was sustained by Mrs. Harris, it was to her back in the precise area where the old tuberculosis of the

spine had deformed her; that if the injury had anything at all to do with bringing about the applicant's present condition, it did so only in connection with some form of reactivation of precisely the condition constituting the preexisting disability and impairment; that if the fall of December 12 caused an aggravation of the old tuberculosis, then all preexisting, permanently impairing effects of that tuberculosis must be determined and deducted from the new total of factors following the injury.

Section 4750 of the Labor Code provides:

"Permanent injury of employee suffering previous permanent disability or impairment: Compensation for later injury: Liability of employer for combined disability. An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment.

"The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

Section 4751 of the same code provides:

"Injury of employee permanently partially disabled resulting in 70% permanent disability: Compensation. If an employee who is permanently partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the previous disability or impairment is a permanent disability equal to 70 percent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury, compensation for the remainder of the combined permanent disability existing after the last injury as provided in this article."

In *Gardner* v. *Industrial Acc. Com.*, 28 Cal.App.2d 682 [83 P.2d 295], this court, in considering an award apportioning disability, stated the general rule to be that industry is to be charged only for those injuries arising out of and in the

course of employment and only for the result of that particular injury when considered by itself and not in conjunction with or in relation to a previous injury.

In *Edson* v. *Industrial Acc. Com.*, 206 Cal. 134, 138-139 [273 P. 572], it is said:

"The plain intent of the act as framed was to charge the employer, and through him industry as a whole, with the loss accruing to the employee and resulting from his employment, i.e., arising out of and in the course of his employment. If the employee has suffered permanent disability by injury or disease prior to the injury for which compensation is sought the statute requires that the percentage of disability on account of the latter injury be computed without reference to any injury previously suffered or any permanent disability caused thereby, except that in the case of aggravation of a pre-existing disease such proportion of the disability due to the aggravation of the prior disease as may be reasonably attributed to the later injury may be considered."

In *Wolski* v. *Industrial Acc. Com.*, 70 Cal.App.2d 427 [161 P.2d 283], the court, in construing section 4750, *supra,* in a case where the employee who had an impaired and defective left eye since childhood lost the sight of his right eye in an industrial accident, held that the petitioner was, prior to the injury to his right eye, "suffering from a previous disability or impairment" within the meaning of section 4750 of the Labor Code and that his employers were liable to him only for that portion of his disability due to the injury to his right eye as though no impairment of the left eye had existed.

In *Tanenbaum* v. *Industrial Acc. Com.*, 4 Cal.2d 615 [52 P.2d 215], the court, in considering the question of apportionment, said, at page 618:

"As we read the record in this proceeding, the petitioner is now suffering from a disability made up in part of an industrial disability growing out of the injury, including the aggravation or 'lighting up' of the preexisting dormant arthritic condition, and, in part, though in a lesser degree, of what may be termed a nonindustrial disability resulting from the normal progress of the preexisting arthritis. Obviously, the latter disability is not attributable to industry and should not be saddled thereon."

In *Colonial Ins. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 79, 83-84 [172 P.2d 884], the court states the rule to be that "an

employer takes the employee as he finds him at the time of employment and when subsequent injury lightens up or aggravates a previously existing condition rendering it disabling, liability for the full disability without proration is imposed upon the employer.'' (Citing cases.) The court then goes on to say:

''It is true that in those cases the disability was apportioned according to the extent it was caused by the preexisting condition and the industrial injury, but there the prior condition had already resulted in a partial disability which was not attributable to his employment while in progressive occupational disease cases the disease is being contracted and accumulated during various employments.''

In *Industrial Indem. Co.* v. *Industrial Acc. Com.*, 95 Cal. App.2d 443, 450 [213 P.2d 11], the court said:

''It was a question of fact for the determination of the commission as to whether applicant's permanent disability resulted from the effects of the accident, including the aggravating effect of the accident upon a preexisting disease, or whether the disability or a part thereof resulted from the normal progress of a preexisting disease. If a part of the disability resulted from the normal progress of a preexisting disease then a portion of the permanent disability rating herein should have been attributed to the preexisting disease. The question therefore is whether there was substantial evidence to support the determination of the commission that there should be no apportionment.''

In the instant case the evidence conclusively shows that Mrs. Harris, from early childhood, suffered from tuberculosis of the spine, with destruction of the first vertebra and a forward angulation of the spine. In 1933, when she was about 9 years old, surgery was performed in which seven vertebrae were fused. During the period beginning with the surgery and until 1942, she had pain and other symptoms, not only in the area of the kyphos and the fusion, but also in her back and legs. She stated to Dr. Crowe that following a spinal puncture in 1941, her left leg became paralyzed and that this paralysis of the leg lasted for several months. It is true that she worked for Goodwill Industries, a corporation employing physically handicapped persons, for several months. ■ However, we conclude that at the time of the accident on December 12, 1949, Mrs. Harris had a partial permanent disability and impaired capacity to work resulting from a previous nonindustrial disease. There is no sub-

stantial evidence in the record to the contrary. Under such circumstances, the commission erred in finding that the injury of December 12th caused total disability and in failing to determine and deduct the percentage of total disability allowable to applicant's condition at the time of the injury.

As was said in *Edson* v. *Industrial Acc. Com.*, supra, at page 138:

"Industry takes the employee as it finds him at the time of the employment. He may have suffered a prior injury, either industrial or nonindustrial. His capacity to serve may have been reduced by an industrial or a nonindustrial disease. It may safely be said that a small proportion of humans are perfect physically and mentally. Disease and accident during childhood and the diseases and habits of adults having no relation to any particular employment result in disability or impaired capacity to work in the sphere of both physical and mental labor. For such disability or impaired capacity the Workmen's Compensation Act was not intended to provide compensation."

In view of what we have here said, it is unnecessary to pass upon the question of whether the Subsequent Injuries Fund should have been joined as a party defendant.

For the reasons given, the award is annulled and the matter is remanded for a new hearing.

Barnard, P. J., and Griffin, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied January 22, 1953. Carter, J., was of the opinion that the petition should be granted.