[Civ. No. 26683. Second Dist., Div. Two. Jan. 15, 1963.]

ALLIED COMPENSATION INSURANCE COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and EDWARD ETKINS, Respondents.

822

Clopton & Penny, Robert M. Penny and Robert C. Kunz for Petitioner.

Everett A. Corten, Edward A. Sarkisian, Rose, Klein & Marias and Eugene Marias for Respondents.

HERNDON, J.—In this proceeding we are called upon to review an award of the Industrial Accident Commission in favor of respondent employee. Petitioner, the insurance carrier for the employer, urges that the award of the commission must be annulled because it was (1) completely in excess of the commission's powers; (2) manifestly unreasonable; and (3) wholly unsupported by any substantial evidence.

Our review of the record discloses that there is no conflict in the evidence insofar as it relates to the facts which are determinative of the controlling issues here presented. The employee, Edward Etkins, was employed on December 1, 1960, as a dress cutter. All the medical experts who testified were in unanimous agreement that *at that time* a giant cell tumor was growing in his left ankle bone, although he was not then aware of its presence. Further, all the medical experts agreed that tumors of this type continue to grow without regard to external factors and gradually weaken the bone structure until their presence ultimately, and of necessity, does become known. From the very inception, the growth process is irreversible, and the only method of treatment is surgical removal.

On December 1, 1960, the employee twisted his left ankle while reaching for a pattern when he placed his foot partially off, and partially on, the edge of a one-inch floor board. He reported this incident to his employer and was directed to a physician. X-rays were taken during this initial visit and again on December 5, 1960. The injury was diagnosed as a sprain perhaps involving a chipped bone. The employee continued working while receiving whirlpool and ultra-sonic treatments until December 23, 1960. At this time, he voluntarily discontinued the treatments and failed to respond to a letter dated January 3, 1961, wherein the treating physician advised him to return if he had not recovered. Although the

existence of the tumor was plainly apparent to tumor experts in the first X-rays taken, its presence was overlooked by the attending physician.

The employee continued working until April 4, 1961, when pain in his ankle again caused him to return to the company doctor. Thereupon an appointment was made for him to be examined in another facility on April 14, 1961. However, the employee, motivated by purposes of personal convenience, decided to seek the examination from a private medical facility, and did so on April 5, 1961. Further X-rays were taken which clearly revealed the existence of the tumor, which had enlarged substantially since the original X-rays were taken on December 1 and 5, 1960. Therefore, on April 13, 1961, the employee entered the hospital where the tumor was surgically removed and a bone graft was made. This period of hospitalization commencing on April 13, 1961, was the first time lost from work by the employee. He was thereafter disabled during the process of the bone fusion, and the commission found that this condition had not become fixed at the time of its award.

On May 24, 1961, the employee filed his application with the commission based upon the injury sustained December 1, 1960. Determination of liability for temporary disability from April 14, 1961, was sought as well as for permanent disability, medical treatment, medical costs and litigation expense. On May 9, 1962, an essentially identical application was filed, except that the injury was claimed to have been caused by the employee's being "on his feet all through the working day resulting in aggravation of tumor." The California Department of Employment filed a "Notice and Request for Allowance of Lien" based upon its payments to the employee of disability benefits for a period commencing April 22, 1961.

Following extended hearings, an order was made on June 19, 1962, wherein the employee was awarded temporary disability indemnity on his initial claim, payable "beginning April 14, 1961, to and including June 11, 1962, and continuing thereafter." The Department of Employment was allowed its lien against said payments in the sum of $1,690. No reimbursement was allowed for the surgical or other treatments procured by the employee prior to May 18, 1961, but reimbursement for self-procured medical treatment procured thereafter was awarded and further medical treatment "con-

sisting of periodic observations" was ordered. It was further ordered that the employee take nothing on his second application, since all determinations required had been disposed of in the order made on the initial claim. However, a finding of fact was made that the employee had suffered "an injury consisting of aggravation of tumor to the left foot and leg, arising out of and occurring in the course of his employment. . . ."

Respondent commission, in its answer to the petition herein, has been content to assert in support of the award that there was competent medical evidence to support a finding that the accident of December 1, 1960, "*aggravated*" the pre-existing condition. There was conflict in the testimony given by the medical experts as to whether or not the employee had suffered a fracture of his ankle bone as the result of the accident of December 1, 1960, and whether, assuming such a fracture, this condition would have affected in any degree the normal growth of the tumor. There also was some conflict as to what effect, if any, walking on the ankle might have had on the development of the tumor. ■ We recognize, of course, that it is the province of the commission as the trier of the facts to resolve any material conflicts in the evidence and that it may accept the evidence of one or more experts in preference to that of others. (*Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal.2d 89, 94 [199 P.2d 302].)

This latter principle, however, is not controlling in the present factual context. As we have previously indicated, all the medical experts agreed that on November 30, 1960, the day before the accident, the employee was as much in need of the very operation ultimately performed as he was at any time thereafter. Further, it was agreed that the disability of the employee was entirely attributable to the performance of the required operation and there was no evidence that this disability was increased in any fashion by the industrial accident. In other words, the injury sustained on December 1, 1960, considered apart from any "aggravating" effect it may have had upon the tumor, was not disabling and had completely healed prior to April 13, 1961. The "aggravation" of the tumor neither caused the need for an operation, (it already existed), nor does it appear that it in any degree increased the disability resulting therefrom.

Thus, the following testimony was given by the medical expert whose opinion that tumors of this type are affected by

traumas is relied upon by the respondent commission in support of its award: "Q. All right. Let's go into this angle. You feel that this fracture, if it did occur, if there was a fracture, and if it did follow injury, had no effect on the overall disease process in this case? A. Well. I think it accounts for the tumor getting larger, and for—it's been my experience when there is enough trauma to produce bleeding that these tumors tend to enlarge. They enlarge. The tumor is filled with big blood vessels and they are benign tumors. Benign tumors are not too significant a tumor if they remain benign. I think they enlarge as a result of hemorrhage into them. Q. And what effect would that have? A. Enlargement on the X-ray. Q. What effect would that have on the overall condition? A. *It would have no effect on it at all* except that the tumor is a benign tumor in the one that we are dealing with, but your fracture brought this hemorrhage on, probably. The trauma did bring it on. Q. As I understand it then, if we assume that there is injury significant enough to cause a fracture, and the fracture is significant enough to cause hemorrhage into the tumor, the only overall effect is it makes the tumor larger for X-ray purposes? A. The symptoms which came on with enlargement would have to be considered, but you are going to have a weaker bone as it occurs also. You are going to have more discomfort in walking on it if it is a weight-bearing thing, but *otherwise the net result of the treatment of the case is what I was meaning* when this changes the appearance of the bone on the X-ray. Q. In other words, this sequence of events as you described it is going to have *absolutely no effect on the net result of the case?* A. *I don't think so.*" (Emphasis added.)

Further: "Q. Well, Doctor, from your experience, then, these tumors are *going to expand in any event, trauma or no trauma,* is that right? A. *That is right.* Q. *They are irreversible unless medically treated?* A. *That's right.*" (Emphasis added.)

Finally: "Q. In other words, if you had seen such an X-ray [showing the tumor as it appeared on December 1, 1960, but not indicating a fracture] the day before this injury, your recommendation still would have been to remove this giant cell tumor, would it not? A. I think so, yes. Q. And that giant cell tumor definitely had to be removed November 30th, did it not? In other words, if you had seen the man on November 30th, the day before this accident, and diagnosed

his condition, your recommendation still would have been on that date to remove the tumor? A. *I am afraid I have to say yes.* . . . Q. Doctor, do you treat giant cell tumors by Ace bandages? A. I think we treat them by surgery. Q. Do you treat them by whirlpool? A. No. Q. Do you treat them by — A. *We only have one treatment and that is surgery.* . . . Q. Doctor, if the X-ray had demonstrated a giant cell tumor, let's say six months before December 1, 1960, your recommendation then, too, would have been surgery? A. Of course. . . . Q. Any weight-bearing at all from the time that the giant cell tumor could first have been demonstrated by X-ray would have been contra-indicated? A. I think I have answered that question by saying I think these patients should go immediately to surgery." (Emphasis added.)

Earlier this doctor had testified: "Q. After the tumor is removed do you believe that any of the condition then remaining has any relationship to the alleged injury of December 1, 1960. A. Well, I think the whole process has been removed by the surgery there, the diseased bone, and the answer is no. Does that answer it?"

In reaching our conclusion herein, we have found it advisable to classify certain of the more fundamental rules in regard to the liability of industry in this field.

██ First, it is, of course, elemental that liability only attaches when an "injury is proximately caused by the employment. . . ." (Lab. Code, § 3600, subd. (c).) ██ If the disability in question results solely from the "natural and normal progress of [a] pre-existing condition", it is not a disability "attributable to industry and should not be saddled thereon." (*Tanenbaum* v. *Industrial Acc. Com.*, 4 Cal.2d 615, 618 [52 P.2d 215].) ██ "Where . . . the proximate and immediate cause of the injury is from disability arising solely from an idiopathic or subjective condition, the weight of authority, including the decisions of this state, are against recovery, though the injury clearly occurs in the course of employment." (*G. L. Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587, 594 [200 P. 17].)

In *California Cas. etc. Exchange* v. *Industrial Acc. Com.*, 76 Cal.App.2d 836, 841-842 [174 P.2d 680], the court, in dealing with a death due to tuberculosis, quoted as the basis for its decision denying liability the following language from a Massachusetts case: " 'It does not afford compensation for injuries or misfortunes which merely are contemporaneous

or coincident with the employment, or collateral to it. Not every diseased person suffering a misfortune while at work for a subscriber is entitled to compensation. The relief is so new that the tendency may be to inquire only as to the employment and the injury, and to assume that these two factors constitute ground for compensation. But the essential connecting link of direct causal connection between the personal injury and the employment must be established before the act becomes operative. The personal injury must be the result of the employment, and flow from it as the including proximate cause. The rational mind must be able to trace the resultant personal injury to a proximate cause set in motion by the employment, and not by some other agency, or there can be no recovery. In passing upon this question, an humanitarian emotion ought not to take the place of sound judgment in the weighing of the evidence. The direct connection between the personal injury as a result and the employment as its proximate cause must be proved by facts before the right to compensation springs into being. A high degree of discrimination must be exercised to determine whether the real cause of an injury is disease or the hazard of employment. A disease which, under any rational work, is likely to progress so as finally to disable the employee, does not become a ''personal injury'' under the act merely because it reaches the point of disablement while work for a subscriber is being pursued. It is only when there is a direct causal connection between the exertion of the employment and the injury that an award of compensation can be made. The substantial question is whether the diseased condition was the cause, or whether the employment was a proximate contributing cause. In the former case, no award can be made; in the latter, it ought to be made.' ''

In *California Notion etc. Co.* v. *Industrial Acc. Com.*, 59 Cal.App. 225, 230 [210 P. 524], the court stated: ''It is the duty and purpose of this court to construe liberally the Workmen's Compensation, Insurance and Safety Act (Stats. 1917, p. 831), to effectuate its purposes and to charge to industry injuries to its employees properly chargeable thereto. But we can see neither reason nor justice in laying down a principle which would give to a man stricken with paralysis while at his place of business the right to throw the financial burden of his disability upon his employer where the *disability* was in no measure increased or contributed to by the employ-

ment, and the physical conditions causing the same were in no measure due thereto. In such a case, the rights of the employee are no greater than they would have been had the attack occurred at his own home, unless it is shown that his *disability* was in some way increased or affected by the incident of place.'' (Emphasis added.)

Finally, as set forth in *Edson* v. *Industrial Acc. Com.*, 206 Cal. 134, 138 [273 P. 572] : ''From the foregoing the purpose of the act with reference to the effect of prior injury or disease is obvious. Industry takes the employee as it finds him at the time of the employment. He may have suffered a prior injury, either industrial or nonindustrial. His capacity to serve may have been reduced by an industrial or nonindustrial disease. It may safely be said that a small proportion of humans are perfect physically and mentally. Disease and accident during childhood and the diseases and habits of adults having no relation to any particular employment result in disability or impaired capacity to work in the sphere of both physical and mental labor. For such disability or impaired capacity the Workmen's Compensation Act was not intended to provide compensation. The plain intent of the act as framed was to charge the employer, and through him industry as a whole, with the loss accruing to the employee and resulting from his employment, i.e., arising out of and in the course of his employment. If the employee has suffered permanent disability by injury or disease prior to the injury for which compensation is sought the statute requires that the percentage of disability on account of the latter injury be computed without reference to any injury previously suffered or any permanent disability caused thereby, except that in the case of aggravation of a preexisting disease such proportion of *the disability* due to the aggravation of the prior disease as may be reasonably attributed to the later injury may be considered.'' (Emphasis added.)

The exception noted in the final sentence of the *Edson* case brings us to the second fundamental consideration. That is, that where a prior condition is aggravated by an otherwise compensable injury, industry is liable therefor but only for the proportion of *the disability* due to the aggravation which is reasonably attributable to such injury. (Lab. Code, § 4663.)

Here, care must be taken to distinguish those instances where the environmental conditions surrounding the employment create the injury although the preexisting condition

is a causal or even the precipitating factor leading to the injury. See the *G. L. Eastman Co.* case, *supra,* where, although a heart condition may have caused the employee to faint, it was the circumstances of his employment that placed him behind the wheel of a truck where he fell from the cab into the path of the wheels.

Also to be distinguished are those cases where *the industrial injury* is aggravated by a *preexisting condition,* rather than the *preexisting condition* being aggravated by the *industrial injury.* Thus, in *Hendrickson* v. *Industrial Acc. Com.,* 215 Cal. 82, 86 [8 P.2d 833], where a diabetic suffered serious disability through merely running a sliver into his hand during his work, the court stated: "There is no doubt that the diabetic condition of the employee contributed to the serious results of the accident and prolonged his disability. We find no authority for prorating the extent of the disability due to the accident itself on the one hand and that due to the aggravation caused by the employee's physical condition on the other. The benefits of the act are not alone for those in prime physical condition. Those less fortunate are equally entitled to compensation, provided, of course, the injury arises out of and is sustained in the course of the employment." Also, in discussing aggravation in *Tanenbaum* v. *Industrial Acc. Com.,* *supra,* 4 Cal.2d 615, the court stated at page 617: "The underlying theory is that the employer takes the employee subject to his condition when he enters the employment, and that therefore compensation is not to be denied merely because the workman's physical condition was such as to cause him to suffer a disability from an injury which ordinarily, given a stronger and healthier constitution, would have caused little or no inconvenience. In such cases full compensation for the entire disability suffered is recoverable although the physical condition of the employee contributed to and increased the disability caused by the injury or prolonged and interfered with healing and recovery."

From the foregoing, it therefore appears clearly that industry is not liable for preexisting disabilities not aggravated by the employment but is fully liable where such preexisting condition, whether disabling or not, causes or aggravates the industrial injury itself. Greater difficulty is presented where it is necessary to apply the rule stated in the *Tanenbaum* case that the "acceleration, aggravation or 'lighting up' of

a preexisting disease is an injury in the occupation causing the same.''

Certain confusion may be created by failing to note that ''acceleration'', ''aggravation'', and ''lighting up'' are not synonymous terms. This confusion is subject to being compounded by a tendency to overlook the fact that ''disability'', as that term is used in connection with the Workmen's Compensation Act, is a composite of two principal elements that, although distinct, generally coincide in greater or lesser degree but need not necessarily do so, i.e., (1) actual incapacity to perform the tasks usually encountered in one's employment and the wage loss resulting therefrom, and (2) physical impairment of the body that may or may not be incapacitating.

Generally speaking, in matters pertaining to temporary disability only, the issue of ''incapacity'' or ''wage loss'' is of dominant importance. Thus, section 4650, Labor Code, provides in part: ''If an injury causes temporary disability, a disability payment shall be made for one week in advance *as wages* on the eighth day after the injured employee leaves work as a result of the injury; . . .'' (Emphasis added.) Section 4651.1 relates to the filing of a petition whenever the temporary disability has decreased or terminated, e.g., the employee is medically capable of resuming some form of employment. Section 4653 covers temporary total disability and provides that ''the disability payment is sixty-five per cent of the average weekly earnings during the period of such disability, consideration being given to the ability of the injured employee to compete in an open labor market.'' Section 4654 covers temporary partial disability and provides that ''. . . the disability payment is sixty-five per cent of the weekly *loss in wages* during the period of such disability.'' (Emphasis added.) Section 4657, also dealing with temporary partial disability provides that in such cases ''the weekly loss in wages shall consist of the difference between the average weekly earnings of the injured employee and the weekly amount which the injured employee will probably be able to earn during the disability, to be determined in view of the nature and extent of the injury.''

When the issue of permanent disability is to be considered the question of disability in the sense of ''bodily impairment'' becomes of much greater moment and the commission is

authorized to adopt a schedule relating to "disabilities" which does not, itself, consider whether the disability is presently incapacitating or not. (§ 4660, subd. (b).) Thus, the California Supreme Court in passing upon the constitutionality of the minimum and maximum "average weekly earnings" provisions of section 4453, although this section relates principally to temporary disability, quoted the United States Supreme Court's holdings "that it was reasonable to assume that disfigurement would interfere with the ability to find gainful employment and also that: '. . . impairment of earning power is [not] the sole ground upon which compulsory compensation to injured workmen legitimately may be based . . .' ", and " '. . . we see no constitutional reason why a State may not, in ascertaining the amount of such compensation in particular cases, take into consideration any substantial physical impairment attributable to the injury, whether it immediately affects earning capacity or not.' " (*Madin* v. *Industrial Acc. Com.*, 46 Cal.2d 90, 97-98 [292 P.2d 892].)

In another instance our Supreme Court stated: "It is settled law in this state that an employee may receive a permanent disability rating of 100 per cent and be entitled to the disability payments incident to such rating although he is able to return to work at the wages he received before the injury which caused disability. '[T]he right to compensation is not lost or diminished by the injured employee's return to work at the same or a different wage than that theretofore earned by him. The statute does not require a showing of loss of earning power as a prerequisite to the payment of compensation for a permanent disability, but, on the contrary, provides for the payment in installments of a fixed and definite sum of money therefor.' [Citations.]" (*Smith* v. *Industrial Acc. Com.*, 44 Cal.2d 364, 367 [282 P.2d 64].)

With these considerations and distinctions in mind, a determination of particular problems is simplified. Thus, where an employee suffers an industrial injury and at the time is afflicted with a preexisting condition that is disabling, at least in the sense of constituting a physical impairment, and perhaps in the sense that the prior condition was of the type that it was capable of being rated so as to have supported a prior award if it had been industrially caused (*Ferguson* v. *Industrial Acc. Com.*, 50 Cal.2d 469, 477 [326 P.2d 145]), such employee might be entitled to full temporary disability

payments but only to a proportionate permanent disability payment.

For example, if the preexisting condition is dormant and not disabling in the sense of rendering the employee incapacitated for the work for which he is employed, an industrial injury that "lights-up" this condition, thereby rendering him incapacitated, would ordinarily support an award for temporary disability, but perhaps only a proportionate permanent disability award. (Compare *Goodwill Industries* v. *Industrial Acc. Com.*, 114 Cal.App.2d 452 [250 P.2d 627], and *City of Glendale* v. *Industrial Acc. Com.*, 153 Cal.App.2d 213 [314 P.2d 182], with *Phoenix Indem. Co.* v. *Industrial Acc. Com.*, 41 Cal.App.2d 858 [107 P.2d 935], *Industrial Indem. Co.* v. *Industrial Acc. Com.*, 95 Cal.App.2d 443 [213 P.2d 11], and *Thoreau* v. *Industrial Acc. Com.*, 120 Cal.App. 67 [7 P.2d 767].) Of course, as also appears in these cases, even though the prior condition is not truly dormant, nonetheless, if it is "accelerated" into an incapacitating stage, the same results generally follow. (See *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 P.2d 142]; *Abelseth* v. *Industrial Acc. Com.*, 8 Cal.App.2d 270 [47 P.2d 516]; and *American Can Co.* v. *Industrial Acc. Com.*, 196 Cal.App.2d 445 [16 Cal.Rptr. 424]; see, also, *Pacific Gas & Elec. Co.* v. *Industrial Acc. Com.*, 56 Cal.2d 219 [14 Cal.Rptr. 548, 363 P.2d 596], relating to an instance of the acceleration of death due to cancer that would have been fatal shortly in any event.)

We have been unable, however, to find any authority relating to the situation where the preexisting condition, per se, may have been "aggravated" but such aggravation did not cause or accelerate incapacity. In our instant case, as has been noted, there was evidence from which the commission might have found that the industrial injury aggravated the existing tumor, but no evidence whatsoever that such aggravation accelerated the need for the actual incapacitating event, i.e., the operation, or that the duration of this incapacity was extended in any degree by the difference in the size of the tumor at the time of the operation between what it would have been under ordinary conditions of growth and what it actually was due to any acceleration of growth due to the accident.

Of course, little or no evidence was taken on this latter subject because both counsel and the commission appear to have been primarily concerned with the issue of the effect

of the injury upon the tumor rather than whether the injury accelerated or prolonged the disability resulting from the operation. This is, of course, understandable because the commission was not then concerned with the question of permanent disability, or apportionment thereof, and it has apparently consistently assumed that temporary disability is never apportionable. (See *American Can Co.* v. *Industrial Acc. Com., supra,* 196 Cal.App.2d 445.)

We need not consider the correctness of this latter assumption in this instance, for, as indicated, we are presently only concerned with whether there was sufficient evidence to support an award of *any* temporary disability payments. That is, if, as appears from the record, the event that caused the employee's incapacity was the required operation, and this operation was required prior to the injury, then the industrial accident neither caused nor accelerated the disability resulting therefrom. Certainly if the X-rays had been interpreted to show the existence of the tumor on the very day of the accident and, therefore, the operation had been performed the following day, it could not be contended that either the costs thereof or the resulting disability would have been a proper burden to place upon the employer since it is conceded that at that stage the industrial injury would not have had any effect whatsoever on the tumor. Does the fact that the existence of the tumor escaped notice for an additional four months until the industrial injury had completely healed alter this result merely because the rate of growth of the tumor may have been increased in some degree where there has been no showing that such increase has any bearing upon the need for the operation or the consequences thereof? We believe it does not.

A case of the present type is clearly distinguishable from the situation presented in the case of *Abelseth* v. *Industrial Acc. Com., supra,* 8 Cal.App.2d 270. There an employee had a history of gastric ulcers which he had treated in the past by means of diet, medicines, etc. Evidence was presented that as the result of an industrially caused strain an ulcer, not then being treated, was caused to perforate, demanding immediate surgical treatment. Unlike our instant case, the preexisting condition then did not require treatment restricted solely to the surgical nor was such treatment imperative absent the aggravation immediately stemming from the industrial injury.

 From all that appears in evidence in our present record, the industrial injury did nothing more than create a circumstance that called the employee's attention to a progressive condition whose growth, if continued unabated by surgical removal, would inevitably lead to a stage where amputation of the affected limb would be required. Under such circumstances, neither the costs of such treatment nor the resulting incapacity should be attributed to industry absent some showing that such costs or incapacity increased by the "aggravation" produced.

This court discussed at considerable length the interrelationships of the Workmen's Compensation Act and the Unemployment Insurance Act, which provides compensation payments protecting a worker against nonoccupational disability, in *California Comp. Ins. Co.* v. *Industrial Acc. Com.*, 128 Cal. App.2d 797, 804-806 [276 P.2d 148, 277 P.2d 442]. Together these statutes form "a general, co-ordinated plan of social insurance developed by the Legislature." In the present case, the employee was entitled to, and actually did receive, disability compensation payments as provided for under the Unemployment Insurance Act. Disability resulting solely from the excising of a tumor, the unavoidable and immediately necessary treatment required as the result of the "natural and normal progress of the preexisting condition", is not a disability "attributable to industry and should not be saddled thereon." (*Tanenbaum* v. *Industrial Acc. Com.*, *supra*, 4 Cal.2d 615, 618.)

The award is therefore annulled and the proceeding is remanded to respondent commission for such further proceedings not inconsistent with the views expressed herein as may be required.

Ashburn, J., and Fox, P. J., concurred.

A petition for a rehearing was denied on February 14, 1963, and the following opinion was then rendered:

THE COURT.—Petition for rehearing denied. *State Compensation Ins. Fund* v. *Industrial Acc. Com.*, 59 Cal.2d 45 [27 Cal.Rptr. 702, 377 P.2d 902], decided by the Supreme Court since the filing of our opinion lends further support to our decision.