Filed 5/23/13  Hegedus v. Behavioral Health Services CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN PAUL HEGEDUS,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>BEHAVIORAL HEALTH SERVICES, INC., et al.,<br><br>  Defendants and Respondents. | B233098<br><br>(Los Angeles County<br>Super. Ct. No. NC053201) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Madden, Judge.  Affirmed.

John Paul Hegedus, in pro. per., for Plaintiff and Appellant.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Margaret M. Holm and Kyle C. Worrell for Defendants and Respondents.

After plaintiff John Paul Hegedus pleaded guilty to second degree burglary for fraudulently obtaining prescription drugs, the court sentenced him to 365 days in Orange County jail and stayed 275 days of the sentence on condition that Hegedus complete a 90-day residential drug treatment program. Hegedus completed 35 days as a resident of Thomas Redgate Memorial Recovery Center (Redgate) before he was administratively discharged for violating Redgate's rules. Hegedus, representing himself, sued Behavioral Health Services, Inc. (BHS), which owns and operates Redgate, and BHS employees, alleging numerous causes of action arising from his discharge and the failure to timely resolve his appeal from the discharge. After a 10-day jury trial, the jury was instructed on intentional infliction of emotional distress, Hegedus's only remaining claim. The jury returned a defense verdict. Hegedus filed this appeal, contending the jury also should have been instructed on professional negligence, the common knowledge exception, and negligence per se. We affirm because there was no instructional error.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Admission and Administrative Discharge from Redgate for Rules Violation*

Hegedus acknowledged to counselors at Redgate that he was at the treatment center to "get out of jail free." He was admitted on July 25, 2008.[1] This was Hegedus's second admission to Redgate – he was admitted in June to the detox unit, but left against medical advice when he learned that his stay in the detox unit did not count toward his 90-day commitment.

According to Hegedus, Redgate had some 153 rules to live by while in residential treatment. Hegedus broke one of the rules on August 20, while on a pass permitting him to leave the treatment center. Hegedus turned himself in, and Kijoma Marsh, his primary drug and alcohol counselor, placed Hegedus on a "behavior contract." The behavior contract mandated that Hegedus comply with Redgate's rules.

On August 28, Hegedus broke several rules when he left a Cocaine Anonymous meeting to answer a phone call. Defendant Emmons Sebenius, a Redgate drug and

---

[1] Unless stated, all further events occurred in 2008.

2

alcohol counselor, discovered Hegedus using the pay phone, which violated the treatment center's phone rules. The following day, Hegedus was administratively discharged from Redgate.

Hegedus invoked the BHS grievance procedure to appeal from his discharge. Dated August 31, Hegedus prepared a letter addressed to defendant Laurie Dent-Snyder (Snyder), the administrator at Redgate, seeking reinstatement (appeal letter). Hegedus got no response from Snyder by his probation officer's September 5th deadline. Hegedus was arrested and taken into custody for a probation violation.

While in jail awaiting his probation revocation hearing, Hegedus continued to make efforts to be reinstated at Redgate. Dated September 29, Hegedus addressed a letter to Alyce Belford, the designated representative in the BHS grievance procedure, and he attached his August 31 appeal letter. Theresa Cannon, the chief compliance officer for BHS, received the Belford letter and investigated the allegations. After conducting an investigation, Cannon concluded that the discharge was handled according to policy and Hegedus could not return to Redgate. Cannon, however, arranged for Hegedus's admission to another BHS residential treatment program.

On October 6, Hegedus had his probation revocation hearing. Hegedus's criminal defense counsel and the district attorney were aware that Hegedus could have been admitted to another BHS treatment program, but Hegedus pleaded guilty to a probation violation. Hegedus served 210 days in the Orange County jail.

2. *Proceedings*

Hegedus filed this action, alleging that he would not have served his jail sentence but for his wrongful administrative discharge from Redgate. His complaint asserted causes of action for negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, violation of the Unruh Civil Rights Act, and conspiracy against multiple defendants, including BHS, Marsh, Sebenius, and Snyder.[2] The crux of

---

[2]     Hegedus also filed an administrative complaint with the California Department of Alcohol and Drug Programs.

3

the negligence cause of action was the defendants breached their respective duties to him when they "falsely, recklessly, maliciously, arbitrarily, capriciously, and without probable cause [wrote] up a pretextual violation of the Redgate phone policy against Plaintiff so as to operate as a covert conspiratorial mechanism to have him administratively discharged from the Redgate Residential Rehabilitation Unit." Snyder and Marsh also allegedly breached their duty toward him by failing to comply with the BHS grievance procedure.

3. *Trial*[3]

Hegedus represented himself at trial, drawing on his legal education and his 28 years of experience in civil litigation working as a research paralegal. His theory at the beginning of trial was that BHS, through its employees Marsh, Sebenius, and Snyder violated BHS policies and their professional duties as set forth in the counselor's code of conduct (Cal. Code Regs., tit. 9, § 13060, subd. (b)(1)),[4] by administratively discharging him from Redgate and failing to timely address his appeal as required under the BHS grievance procedure.

By closing arguments, Hegedus had dropped the theory that he was discharged based upon a pretextual violation of the phone policy and narrowly focused on the failure

---

**3** In accordance with the customary rule of appellate review, we state the facts most favorably to the party appealing instructional error and must assume the jury may have believed appellant's evidence. (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1152, fn. 2.)

**4** The regulation states: "(a) Each certifying organization shall require registrants and certified AOD counselors to comply with a code of conduct developed by the certifying organization in compliance with the requirements of this regulation. [¶] (b) At a minimum, the code of conduct shall require registrants and certified AOD counselors to: [¶] (1) Comply with a code of conduct developed by the certifying organization; [¶] (2) Protect the participant's, patient's, or resident's rights to confidentiality in accordance with Part 2, Title 42, Code of Federal Regulations; [¶] (3) Cooperate with complaint investigations and supply information requested during complaint investigations unless such disclosure of information would violate the confidentiality requirements of Subpart 2, Title 42, Code of Federal Regulations." (Cal. Code Regs., tit. 9, § 13060, subds. (a)(b).)

4

to adhere to the BHS grievance procedure.  Hegedus states:  "Appellant's theory of his case was based upon his August 31, 2008 appeal of his discharge and Respondents [*sic*] negligence for failing to follow the Redgate grievance and appeal procedure with its three (3) day meeting rule."

    a.  *Hegedus's Expert is not Qualified to Testify, and Hegedus Focuses on Negligence Per Se and Intentional Infliction of Emotional Distress*

Although Hegedus maintained expert testimony was not necessary to prove his negligence claim, he later conceded the point during trial.[5]  Hegedus intended to call as a witness his designated expert Kathryn Frost.  The trial court held a foundational hearing and concluded Frost was not qualified to testify.  Following this ruling, the court stated: "Plaintiff has two causes of action styled negligence.  One entitled negligence; the other is negligent infliction of emotional distress.  I think they're a single cause of action for negligence, and I think that under the circumstances of this case plaintiff, without the testimony of Ms. Frost or without any expert witness, is not precluded from proceeding as to a claim based upon negligence per se."

Hegedus's theory of liability shifted to negligence per se, stating on the record that this was a regulatory case, and not a professional negligence case against BHS.  As for the individual defendants, Hegedus stated: "I would concede . . . we needed a counselor standard of care and we're not going to go that route.  Let's just focus on negligence per se and the intentional tort."

---

[5]    BHS operates Redgate, which is licensed pursuant to Health and Safety Code section 1250.3, subdivisions (a) and (b)(2), as a chemical dependency recovery hospital. A chemical dependency recovery hospital is a health care provider.  (Civ. Code, § 3333.1, subd. (c)(1).)  Professional negligence is defined by statute as:  "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury . . . provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (*Id*., subd. (c)(2).)  By statute, a chemical dependency recovery hospital must provide the following services:  "patient counseling, group therapy, physical conditioning, family therapy, outpatient services, and dietetic services."  (Health & Saf. Code, § 1250.3, subd. (a).)

5

b. *Regulatory Violations (Negligence Per Se)*

Janelle Ito-Orille (Ito), complaints unit supervisor with the California Department of Alcohol and Drug Programs, investigated Hegedus's administrative complaint following his discharge from Redgate. During the course of her investigation, Ito discovered that Snyder had improperly used the title "MFT," the acronym for a marriage and family therapist, when in fact she was an intern and should have used the title "MFTi." Snyder was cited for violating the counselor code of conduct in California Code of Regulations, title 9, section 13060, subdivision (b)(1). Marsh also was cited, as he brought to Ito's attention that he improperly used a speed note in Hegedus's chart. A speed note is a generic notation that a counselor uses for everyone in group treatment, and Marsh admittedly had a duty to prepare accurate and specific notes in Hegedus's chart related to his individual treatment.

c. *BHS Grievance Procedure – Three-Day Meeting Rule (Negligence Per Se)*

Hegedus attempted to elicit testimony to establish that violating the BHS grievance procedure also was a breach of the counselor's code of conduct (Cal. Code Regs., tit. 9, § 13060). Cannon testified that when a program director received a grievance or a complaint letter from a resident, under the BHS grievance procedure the program director had three days to contact the resident to schedule a meeting (three-day meeting rule). The BHS grievance procedure mandates that the program director give the client a written decision within three days of the scheduled meeting. If the client is not satisfied with the decision, the BHS grievance procedure permits an appeal to a designated administrator, and, if the resident still is not satisfied, he or she can appeal to BHS executive management.

Cannon testified, assuming Snyder received Hegedus's appeal letter, the BHS grievance procedure states Snyder had to schedule a meeting within three days. Snyder was aware of the BHS grievance procedure, including the three-day meeting rule. Snyder did not meet with Hegedus.

There was conflicting testimony as to whether Snyder actually received the appeal letter. Hegedus testified that he hand-delivered his appeal letter on August 31 to Marsh.

6

Hegedus also gave a copy of the appeal letter to former resident John David Lloyd to deliver to Snyder. Lloyd testified that he either put the appeal letter in the box attached to Snyder's door, or he slipped it under the door.

Hegedus called Sebenius after his discharge, and Sebenius testified Hegedus mentioned that he wanted to meet with Snyder. Sebenius did not recall any discussion regarding Hegedus's appeal letter.

Marsh and Snyder testified that they never received Hegedus's appeal letter. Snyder did not see the appeal letter until Cannon sent her a copy via e-mail. Cannon, however, admitted in discovery responses that Hegedus delivered the appeal letter to Marsh on August 31, and Marsh delivered it to Snyder. Cannon testified these responses were inaccurate, and she made a mistake because her investigation revealed that neither Marsh nor Snyder received the appeal letter.

4. *Jury Instructions*[6]

While the parties were finalizing jury instructions, Hegedus withdrew his negligence per se claim. In response to the withdrawal of Hegedus's negligence per se claim, the court stated: "Okay. And that would mean any jury instructions related to a claim of negligence would obviously be withdrawn and any argument with respect to a claim for negligence, whether per se or otherwise, would not be permitted. Is that understood, Mr. Hegedus?" Hegedus responded: "Yes, your honor."

During the final discussion on jury instructions, Hegedus reversed course and requested professional negligence instructions. Hegedus believed his professional negligence claim had been revived based on Snyder's testimony regarding compliance with the three-day meeting rule. The court responded: "I ruled that you don't have a standard of care person, that professional negligence requires an expert witness. I said

---

[6] On appeal, Hegedus appears to suggest that when the court relieved him of his obligation to prepare jury instructions, he also had no obligation to request jury instructions. The record is to the contrary. The court asked defense counsel to prepare all the jury instructions requested by both parties using the software program for the CACI instructions, but it did not relieve Hegedus of his obligation to request instructions.

7

the only possible way you can get into a possible negligence claim would be on a per se basis."

Hegedus asked the court to "resubmit the negligence per se based on my understanding of the court's decision to not allow instructions on ordinary counselor standard of care in light of the Snyder testimony yesterday." The trial court denied the request, stating Hegedus "stipulated [that] negligence is gone."

After the jury was instructed and had begun deliberations, Hegedus asked the court why the jury had not been instructed on professional negligence. The court explained that Hegedus did not have expert testimony to proceed on a claim for professional negligence.[7]

Hegedus did not request any jury instructions related to the common knowledge exception. The court asked Hegedus to prepare a negligence per se instruction, but he did not submit a completed instruction to the court before he withdrew that claim.

5. *Special Verdict, Motion for New Trial, Appeal*

The jury by special verdict decided against Hegedus on his intentional infliction of emotional distress claims and in favor of BHS, Sebenius, and Snyder.[8] After his motion for new trial was denied, Hegedus filed this timely appeal.[9]

## DISCUSSION

1. *Hegedus's Stipulations During Trial*

Raising instructional error on claims for professional negligence and negligence per se, Hegedus ignores the tactical decisions he made during trial not to pursue any

---

[7]    During this colloquy, the court reminded Hegedus that he had waived his claim. Hegedus responded:  "on negligence per se, I agree on that."

[8]    Marsh previously had been dismissed from this action.

[9]    For the first time in his reply brief, Hegedus presents arguments addressing his new trial motion.  Issues raised for the first time in a reply brief are forfeited. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

negligence claim. The trial court and defense counsel were justified in relying on Hegedus's understanding that the jury would not be instructed on negligence.

"[A] party may choose to act as his own attorney." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247.) " '[S]uch a party is to be treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys. [Citation.]' [Citation.]" (*Id*. at p. 1247.) As is the case with attorneys, self-represented litigants must meet the same standards as the attorneys who appear before the court. (*Ibid*.)

An attorney may bind his or her client with respect to certain procedural matters during the course of an action. " 'In retaining counsel for the prosecution or defense of a suit, the right to do many acts in respect to the cause is embraced as ancillary, or incidental to the general authority conferred, and among these is included the authority to enter into stipulations and agreements in all matters of procedure during the progress of the trial.' " (*Linsk v. Linsk* (1969) 70 Cal.2d 272, 277; *Stewart v. Preston Pipeline Inc*. (2005) 134 Cal.App.4th 1565, 1581-1582.)

Although an attorney may not stipulate to give up the substantive rights of the client, he or she may select issues and abandon others during the course of a trial. (*Duffy v. Griffith Co.* (1962) 206 Cal.App.2d 780, 787, 789.) "The trial attorney is in full charge of his client's cause or defense. When representing the defendant he must determine in the first instance what defenses shall be averred and what potential ones shall be omitted. At the trial he must have and exercise discretion to make such tactical decisions as the exigencies of the combat may dictate. His is the legal knowledge and skill that must be consulted in that connection, not the views of a layman; often the decision must be made with celerity and precision. Specifically his is the prerogative of withdrawing one of two defenses when he concludes that it cannot be sustained and that its fruitless pursuit may prejudice the other sound defense." (*Id*. at p. 787.) As the *Duffy* court states, the trial court and opposing counsel are justified in relying upon the apparent and presumptive authority of the attorney to make tactical decisions to pursue a cause or defense. (*Id.* at p. 788.)

9

Acting as his own attorney at trial, with even more authority over his case than the attorney in *Duffy*, Hegedus made tactical decisions related to his negligence claim. He conceded on the record that it was fruitless to pursue professional negligence against the defendants because he did not have a qualified expert, and he told the court and defense counsel that he intended to "focus on negligence per se and the intentional tort." Hegedus then narrowed the issues by focusing on establishing regulatory violations to prove negligence per se, under the theory that a violation of the BHS grievance procedure constituted a violation of the counselor code of conduct as set for in California Code of Regulations, title 9, section 13060. Before the jury was instructed, Hegedus agreed to withdraw his negligence per se claim. Hegedus represented to the court that he understood the effect of his withdrawal, that is, the jury would not be instructed on any negligence claim. He cannot now claim instructional error on the very claims he withdrew and decided not to pursue at trial.

It appears that Hegedus's instructional error arguments are premised on his unsuccessful attempt to rescind (1) his oral agreement not to pursue a professional negligence claim, and (2) his decision to withdraw his negligence per se claim. "[T]he court, in the exercise of its sound discretion, may set aside a stipulation entered into through inadvertence, excusable neglect, fraud, mistake of fact or law, where the facts stipulated have changed or there has been a change in the underlying conditions that could not have been anticipated, or where special circumstances exist rendering it unjust to enforce the stipulation." (*L.A. City Sch. Dist. v. Landier Inv. Co.* (1960) 177 Cal.App.2d 744, 750.)

The trial court did not abuse its discretion in denying Hegedus's request to be relieved of his agreement to focus on negligence per se, rather than professional negligence. Snyder's testimony, which he argued was sufficient to establish the standard of care, repeated Cannon's earlier testimony related to the BHS grievance procedure and was not an unanticipated sea change that justified reversing the course of the trial. Taking Snyder's testimony in the context of the trial, Hegedus was attempting to establish that the failure to adhere to the BHS grievance procedure violated the

10

counselor's code of conduct, a necessary element in his negligence per se claim. Relieving Hegedus of his agreement to focus on negligence per se would have prejudiced the defendants, not Hegedus. Based upon Hegedus's representations, the defense did not call their designated expert witness.

As for the negligence per se claim, the record indicates that after the jury was instructed, Hegedus acknowledged that he had withdrawn that theory of liability. There also is nothing in the record to suggest that there were any grounds that would justify setting aside his agreement to withdraw this claim, other than an unfavorable ruling in his attempt to revive his professional negligence claim. Under these circumstances, Hegedus has not shown reversible error.

2. *Instructional Error*

Giving Hegedus the benefit of the doubt, as the record reflects the court did throughout the trial, we address his claim of instructional error. Hegedus contends that the trial court erred in refusing instructions on professional negligence, the common knowledge exception, and negligence per se. These contentions lack merit. There was insufficient evidence to instruct the jury on professional negligence; he did not request an instruction on the common knowledge exception at trial; and Hegedus did not present a complete instruction to the court to instruct on negligence per se before he agreed to withdraw this cause of action.

a. *Professional Negligence and Common Knowledge Instructions*

Hegedus contends on appeal that "the court's decision not to instruct the jury on professional negligence under the common knowledge exception prejudiced the outcome of plaintiff's case and resulted in a miscarriage of justice." There was no instructional error. As noted, by the time the jury was instructed, Hegedus's theory of liability was limited to recovering emotional distress damages.[10]

---

[10] Hegedus argues that the jury's confusion regarding the definition of "outrageous conduct," for purposes of establishing intentional infliction of emotional distress, demonstrated they were "looking for some other instruction to impose liability." We

11

1. *Insufficient Evidence to Support Professional Negligence Instruction*

Hegedus's argument that the jury should have been instructed on professional negligence is a concession that his claim against BHS and its employees required expert testimony. He argues the trial court prejudicially erred in refusing to instruct on professional negligence because Cannon's and Snyder's testimony was sufficient expert testimony to establish duty, breach, and causation. Based upon our independent review of the record, we are not persuaded.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) Here, there was insufficient evidence to instruct.

Whenever negligence in the execution of one's professional duties is involved, expert testimony is generally required to establish the applicable standard of care and breach of that standard. (See *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701-703; *Liberty Mut. Ins. Co. v. Industrial Acc. Com.* (1948) 33 Cal.2d 89, 95.) Hegedus conceded at trial that he could not present expert testimony on a chemical dependency recovery hospital's standard of care and breach of the standard of care as to BHS, its administrators, and its drug and alcohol counselors. Without expert testimony, there was insufficient evidence to instruct on professional negligence.

Hegedus contends, however, that Cannon's and Snyder's testimony regarding adherence to the BHS grievance procedure, including the three-day meeting rule, was sufficient expert testimony. Hegedus maintains that Snyder, the administrator at Redgate, testified that all employees must adhere to BHS policies and procedures.[11] The three-day

---

cannot speculate on the jury's confusion, but it is unlikely that it stemmed from the failure to instruct on other theories of liability.

[11] This cited testimony is far from clear. "Q  Now, there are regulations at the level of the Redgate facility dealing with people. Do you have to figure out ways to implement those regulations? [¶] A  Well, there's a standard of care – I mean, across B.H.S.  So implementation would not have been appropriate unless there were changes to the

12

meeting rule in the BHS grievance procedure was not adhered to in his case. This evidence sufficiently apprised the jury of the BHS grievance procedure and that Redgate did not adhere to these procedures, without further necessity of expert testimony. Hegedus, however, has not cited to any expert testimony that the failure to follow the three-day meeting rule in the BHS grievance procedure was a substantial factor in causing him to go to jail.

"[P]roffering an expert opinion that there is some theoretical possibility the negligent act *could have been* a cause-in-fact of a particular injury is insufficient to establish causation." (*Jennings v. Palomar Pomerado Health Services, Inc.* (2003) 114 Cal.App.4th 1108, 1118.) Expert testimony positing a " 'mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant*.' " (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 775-776.)

It is purely speculative that the failure to adhere to the three-day meeting rule in the BHS grievance procedure was a substantial factor in causing Hegedus to go to jail. Pursuant to the grievance procedure, Snyder had three business days after the scheduled meeting to reach a decision on the appeal. Doing the simple arithmetic, assuming Snyder received the appeal letter delivered by Lloyd, or Marsh personally delivered his copy to Snyder on September 1, Hegedus calculates that Snyder would have had three business days, or until the close of business on September 4 to schedule the meeting. After the scheduled meeting, Snyder had to render a decision on the grievance within three business days, or by September 9.[12] Hegedus was taken into custody on September 5 for a probation violation, before a decision would have been required under the BHS grievance procedure.

---

standard of care. And – But making sure that the policies and procedures are adhered to, yes."

[12]     We take judicial notice of the 2008 calendar. (Evid. Code, § 452, subd. (f).)

13

It also is purely speculative that Hegedus would have been reinstated at Redgate if the meeting had been scheduled. Hegedus concludes that "[Cannon] also pinned proximate cause on Snyder by stating that once she received plaintiff's appeal letter, she offered reinstatement in four (4) days." Cannon, however, upheld the discharge from Redgate. She testified that Hegedus could not return to Redgate and located another BHS facility for his treatment. Hegedus instead pleaded guilty to a probation violation. This evidence establishes, at most, a mere possibility, which is not enough to present the issue to the jury. Accordingly, there was insufficient evidence to instruct on professional negligence.

2. *Common Knowledge Exception Instruction Was Never Requested*

To claim error, Hegedus must show where in the record the instruction was requested. (*Douglass v. Webb* (1962) 209 Cal.App.2d 290, 303.) As the Supreme Court has recognized, " ' " '[i]n a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" [Citation.]' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131.) The failure to instruct on the common knowledge exception was not error.

In professional negligence cases, the Supreme Court has articulated a "common knowledge exception" to the expert testimony requirement. " ' "The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' [Citations.] The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitor, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citations.] The classic example, of course, is the X-ray revealing a

14

scalpel left in the patient's body following surgery. [Citations.]" (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001, fn. omitted (*Flowers*).)

Hegedus did not request the common knowledge exception instruction, and he does not articulate or proffer the instruction that he would have proposed. Instead, Hegedus argues the trial court should have instructed the jury on the duty of the hospital (CACI No. 514) and the standard of care (CACI No. 600). Both instructions require expert testimony. The common knowledge exception was an afterthought, raised by Hegedus for the first time in his motion for new trial. Even if it had been requested, the instruction would not have been appropriate because Hegedus no longer had any negligence claim by the time the jury was instructed.

To the extent Hegedus views the common knowledge exception as the equivalent of ordinary negligence, he "confuses the manner of proof by which negligence must be established and the character of the negligence itself." (*Flowers*, *supra*, 8 Cal.4th at p. 1000.) Hegedus conceded that the duty of care owed by BHS and its employees required the degree of skill and knowledge possessed and exercised by members of that profession, rather than an ordinary standard of care.[13] As the Supreme Court noted in *Flowers*, "[a]s to any given defendant, only one standard of care obtains under a particular set of facts, even if the plaintiff attempts to articulate multiple or alternate

---

[13] Hegedus cites several cases addressing the distinction between professional negligence and ordinary negligence in a hospital setting. (*Flowers*, *supra*, 8 Cal.4th 992; *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690; *Gopaul v. Herrick Memorial Hosp.* (1974) 38 Cal.App.3d 1002.) Only the *Massey* court applied the common knowledge exception. (*Massey v. Mercy Medical Center Redding*, *supra*, at pp. 695-697.) *Massey* is similar to the line of res ipsa loquitor cases where a foreign object is discovered in a patient after surgery. *Massey* involved a nurse's duty to his patient. The patient was on a fall-prevention protocol. The patient needed assistance to walk short distances with his walker, and he fell when the nurse left him unattended on his walker for 15 minutes. (*Id.* at pp. 696-697.) As the *Massey* court noted, "common knowledge and experience can be used to determine whether the patient fell because she or he was insufficiently attended to by medical personnel." (*Id.* at p. 697.) This legal theory is inapplicable here because, in this case, the injury (i.e., serving a jail sentence) could have happened in the absence of negligence.

15

theories of liability." (*Flowers*, *supra*, 8 Cal.4th at p. 998.)  Thus, there was no error in failing to instruct on an inapplicable legal theory never presented at trial.

      b.  *Proposed Negligence Per Se Instruction Was Incomplete and Withdrawn*

      Even if Hegedus no longer stands by his agreement to withdraw his negligence per se claim, there was no error.  Hegedus had to present a complete instruction to the court.  (*Metcalf v. County of San Joaquin, supra,* 42 Cal.4th at pp. 1130-1131.)  While Hegedus presented a draft instruction to opposing counsel, it was never finalized, or presented and rejected by the court.  Thus, Hegedus has forfeited this claim of error.

      Hegedus also appears to contend there was sufficient evidence presented to instruct on negligence per se based on Ito's testimony that Marsh and Snyder violated the counselor code of conduct (Cal. Code Regs., tit. 9, § 13060).  " '[T]he doctrine of negligence per se . . . creates an evidentiary presumption that affects the standard of care in a cause of action for negligence.' [Citation.]" (*Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549, 555.)  Evidence Code section 669 creates a presumption of negligence where a defendant "(1) . . . violated a statute, ordinance, or regulation of a public entity;  [¶]  (2) The violation proximately caused death or injury to person or property;  [¶]  (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and  [¶]  (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."  The first two elements are questions of fact, while the latter two are questions of law.  (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1420.)

      Hegedus was not entitled to this instruction as a matter of law.  He presented no evidence that his injury, that is, serving his jail sentence, was related to Marsh's charting error or Snyder mistakenly holding herself out as a marriage and family therapist. Moreover, Hegedus did not present evidence that the failure to adhere to the internal BHS grievance procedure violated a statute, ordinance, or regulation of a public entity.  Thus, Hegedus has not shown instructional error.

16

DISPOSITION

The judgment is affirmed.  No costs are awarded.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

17